Eugene L. Freeland and Vera Good Freeland by Eugene L. Freeland as her Conservator v. Commissioner. Margaret C. Lowthian v. Commissioner.
Freeland v. Commissioner
Docket Nos. 5181-64, 5182-64.
United States Tax Court
T.C. Memo 1966-283; 1966 Tax Ct. Memo LEXIS 5; 25 T.C.M. (CCH) 1473; T.C.M. (RIA) 66283; December 30, 1966
Frank Kockritz, Bank of America Bldg., San Diego, Calif., Adam Y. Bennion, and Thomas F. Greaves, for the petitioners. Edward M. Fox, for the respondent. TANNENWALD
Memorandum Findings of *6 Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in income tax for the calendar years and in the amounts as follows: Docket
Defi-
No.
Petitioner
Year
ciency
5181-64
Eugene L. Freeland and
Vera Good Freeland
1956
$93,332.32
1957
31,094.54
1958
41,592.57
1959
28,030.18
1960
31,357.45
1961
14,062.72
5182-64
Margaret C. Lowthian
1956
10,231.29
1957
9,628.23
1958
5,751.23
1959
0
1960
13,152.26
1961
0
Some of the issues have been settled by the parties. The only issues remaining for decision are: (1) Was the land owned by a partnership held primarily for sale to customers in the ordinary course of business so as to give rise to ordinary income instead of capital gain on the sale by petitioners of their partnership interests? (2) Did respondent abuse his discretion by reopening petitioners' taxable year 1956, which had previously been audited, and by determining additional deficiencies for said year? Findings of Fact Some of the facts are stipulated and are found accordingly. Eugene L. Freeland and Vera Good Freeland [1] are husband and wife. Margaret C. *7 Lowthian is a single woman. Petitioners reside in San Diego County, California, and they filed their respective tax returns for the years in question with the District Director of Internal Revenue at Los Angeles, California. At all times material Lowthian was Freeland's secretary and business associate. Her participation in the transactions involved herein was through and with Freeland. The tax treatment accorded to Freeland will control with respect to the tax treatment of the transactions as far as Lowthian is concerned. From 1923 through the time of trial, Freeland has been a full time civil and structural engineer living and working in San Diego County, California. He is licensed to practice by California and certain other states and has been and continues to be a member of numerous professional engineering associations and societies. During the years involved herein, he was a senior member of a civil engineering firm and a structural engineering firm. Freeland's practice has included land surveying, *8 the design of municipal improvements, the subdivision of land, and the design of buildings and structures. He rendered professional services in some of the larger real estate developments in the San Diego area and included among his clients some of the area's most active real estate subdividers and developers. Because of the rapid growth of San Diego County prior to and during the years in question, and because of his excellent reputation, Freeland's practice has been financially successful. The growth of San Diego County has also resulted in a continuing and substantial appreciation in real estate values. Among the many land developers employing Freeland and/or his civil engineering firm (hereafter referred to as the "engineering partnership") were George T. Forbes and Theodore M. Jacobs, doing business as Kensington Heights Company. In the late 1940's and again in 1951 and 1953, the engineering partnership rendered services to Kensington with respect to the so-called Waring Ranch property in the form of surveying the land, preparing boundary, topographical and master plan maps thereof, and representation before the City of San Diego Planning Commission and other city departments *9 in its efforts to have the land annexed to the City of San Diego so as to make it more salable. Four hundred acres were annexed in 1951 and subsequently sold by Kensington. An additional 1,300 acres were annexed in 1952 or 1953 and sold by Kensington to Bollenbacher & Kelton, Inc., subdividers and developers. The engineering partnership was then employed by Bollenbacher & Kelton, Inc. to do the engineering work on the subdivision and development of the 1,300 acres. In 1953, efforts were made by Kensington to have the City of San Diego annex the remaining 4,500 acres. At the time of the annexation proceedings, the engineering partnership prepared a master plan map of the area, which indicated the lines along which development might feasibly proceed. The City of San Diego annexed the 4,500 acres in December of 1953. The 4,500 acres contained a lake, some canyons, and a mountain rising about 1,100 feet above the surrounding terrain. Shortly before the annexation, Kensington sought Freeland's help in finding a buyer for the 4,500 acres. Freeland contacted several clients who were not interested because they thought that development and subdivision of the area was too remote in time. *10 In April 1954, Kensington gave Freeland a verbal option on the land. Freeland and one of his developer-clients, Sam Berger, decided to form a partnership to purchase the land. On August 6, 1954, they entered into an agreement to form the partnership, the terms of which were to be reduced to writing in the near future. Under the agreement, Berger was to enter into an escrow in his own name for the purchase of the land from Kensington. Before the close of the escrow, Berger was to nominate the partnership to take title to the land. Berger negotiated the terms for the purchase with Kensington. In the course of the discussions, Berger indicated that the whole 4,500 acres would be developed as soon as possible and that he had $20,000,000 in financing available, which was not in fact the case. Berger also told Kensington that the purchase price would be paid off in about three years. On August 6, 1954, Berger entered into an escrow agreement with Kensington. The agreement provided for a total consideration of $4,676,666.66 (computed on the basis of $800 per acre plus interest at 3 1/3 percent), payable $100,000 down and the balance in 20 annual installments. The purchase price was *11 to be evidenced by an installment promissory note, the first installment of $180,000 to become due on August 6, 1955, with the remaining installments due annually thereafter in increasing annual amounts of $6,000 until the 19th installment in the amount of $288,000. The 20th and final installment was to be the remaining balance of $130,666.66. The escrow agreement contained provisions for the release of 150 acres against each annual payment, for the privilege of prepayments with appropriate adjustments for interest, and for the deposit by the purchaser of $200,000 to be disbursed for off-site improvements upon instructions from Kensington. The term "off-site improvements" comprehended two things: (a) the bringing of utilities, viz., water, sewer, gas, electricity, and telephone, from a point distant from the boundaries of the property being developed up to the boundaries of such property; and (2) the installation of a utility, e.g., a water main, on the property being developed, which utility is larger than required to serve such property but which is nevertheless required by the City of San Diego in order to be available to serve further outlying property in the path of future development. *12 With regard to these latter "off-site improvements," the city generally paid the difference between what the property being developed required and what the city insisted upon for purposes of future property development. Freeland provided $70,000 towards the $100,000 down payment. Berger borrowed the other $30,000 with Freeland acting as guarantor of the loan. In the process of trying to raise the $200,000 deposit, Freeland contacted the General Petroleum Corporation, seeking a loan. As part of the attempt to borrow the funds, a letter was sent on September 14, 1954, over Freeland's signature, but without identification as to the capacity in which he was signing, to General Petroleum Corporation's representative in San Diego. The letter proposed that the corporation lend the necessary funds in exchange for exclusive service station sites within the contemplated 4,500-acre development. The letter also stated that a master plan for the development of the entire 4,500 acres was being completed and that it was proposed to start immediately the development of approximately 2,000 homes. The letter further stated that it was anticipated that a minimum of 4,000 homes would be constructed *13 and occupied within three years and that, after the points involving financing the off-site improvements, completing the master plan, and selecting the location of the first 2,000 homes had been settled, consideration would be given to the sale of acreage to subdividers capable of proceeding with the development in a satisfactory fashion. After due consideration, General Petroleum declined to provide any funds. After several unsuccessful attempts to raise the $200,000 from various other sources, Berger's associates in a development operation consisting of a joint venture of several corporations, known as "Country Club Park" (for which Freeland individually acted as a consultant before various governmental agencies), agreed to put up the $200,000 for the off-site improvements. In return, this group (hereafter referred to as the "Barenfeld-Glaser Group") received a 20 percent interest in the Berger-Freeland partnership. On October 21, 1954, the Lake Murray Development Company, a California corporation (hereinafter referred to as "LMDC"), was incorporated for the purpose of subdividing and developing land and constructing homes thereon. LMDC was capitalized with funds that were advanced *14 by the Barenfeld-Glaser Group. The stock of LMDC was held by Herbert Glaser, an attorney, as trustee for the benefit of the corporations which comprised the Country Club Park joint venture. Berger was the initial president of LMDC and Herbert Glaser was its secretary and attorney. Neither Freeland nor Lowthian was an officer, director, stockholder, or investor in LMDC. Other principals included Sam Glaser, the father of Herbert, and Jack Barenfeld. Shortly after October 21, 1954, but prior to October 26, 1954, Sam Glaser and Jack Barenfeld caused $200,000 to be advanced by the Country Club Park joint venture to LMDC and thence from LMDC to the Berger-Freeland partnership, Sam Berger Investment Company (hereinafter referred to as "SBIC"). On October 25, 1954, SBIC caused the $200,000 to be deposited in the escrow covering the purchase of the 4,500 acres. On October 26, 1954, the escrow was closed and title in the land was vested in SBIC subject to a deed of trust for the unpaid purchase price. On or about October 26, 1954, SBIC and LMDC entered into an option agreement, which was subsequently reduced to writing and executed on November 23, 1954. Partial consideration for this option *15 was the fact that Sam Glaser and Jack Barenfeld had caused LMDC to provide the $200,000 to SBIC to enable it to close the escrow. The agreement gave LMDC an option to purchase 500 acres of land lying within a larger parcel of approximately 800 acres in the southeast corner of the property for a price of $2,000 per acre. The option agreement further provided in pertinent part: (a) That SBIC was to release from the Kensington escrow a minimum number of acres per year in order to prevent a lapse of its right to continue to release acreage. (b) That if LMDC purchased less than 150 acres per year under its option, SBIC had the right to sell the unpurchased difference. (c) That LMDC realized that SBIC had an oral arrangement with "other subdividers" to purchase portions of the 800-acre parcel within which the 500 acres subject to the option was encompassed. (d) That SBIC would cooperate with LMDC in filing the necessary maps and in expeditiously completing the building lots. (e) That LMDC would submit to SBIC all its contracts with subcontractors for all items of work so as to guarantee that the cost would not exceed a certain minimum. (f) That LMDC should be reimbursed by SBIC *16 for expenses in excess of the stipulated maximum per lot cost of development, and SBIC would retain, as profit, any funds remaining in the trust fund established for lot development. (g) That SBIC would be liable for all off-site improvement costs in excess of the $200,000 originally advanced by LMDC. On November 23, 1954, the date on which the option agreement between SBIC and LMDC was signed, a formal limited partnership agreement was also executed by all of the general and limited partners in SBIC. This agreement was effective as of August 6, 1954. Under the terms of the agreement, Freeland, with a 32 percent interest, and Berger, with a 20 percent interest, were the general partners. Lowthian, with an 8 percent interest, was Freeland's designee and was a limited partner. The HAB Trust and the MLB Trust, [2] each with a 10 percent interest, were Berger's designees and were limited partners. The final 20 percent was a limited partnership interest held under the name of Lake Murray Trust No. 1. The interests of the HAB Trust and the MLB Trust in SBIC were created by Sam Berger for his two sons, Harvey A. Berger and Marshall L. Berger. Sam Berger was the sole trustee of the HAB *17 Trust and the MLB Trust. Neither the beneficiaries of these trusts, Harvey A. Berger and Marshall L. Berger, nor the trusts themselves held any interest in LMDC. The 20 percent interest in SBIC, held under the name of Lake Murray Trust No. 1, was established for the benefit of Jack Barenfeld and Samuel Glaser. At a later date, Barenfeld and Glaser gave 10 percent of their interest in this trust to the other members of the Barenfeld-Glaser group. The preamble to the SBIC partnership agreement provided that the purpose of the partnership was to engage "in the business of buying, selling and developing land upon the real property commonly known as the Third Annexation of the Waring Property consisting of approximately four thousand five hundred (4500) acres of land in the City of San Diego, State of California." The body of the agreement provided, inter alia: (a) That the term of the partnership would be 10 years. (b) That each partner, general or limited, was prohibited from selling, assigning, or transferring his interest in the partnership *18 to any person other than another partner but that the agreement would subsequently be amended to resolve the question of the withdrawal or sale by the partners of a partnership interest. (c) That Freeland and Berger were to contribute $70,000 and $30,000, respectively, to the partnership but further that they could withdraw said sums from the first monies available to the partnership. (d) The general business policy of said partnership in all questions relating to the management of its business should be determined by the mutual consent of the general partners. (e) Both general partners were to have full management rights and control. (f) Freeland was to receive an engineering fee of $25 per lot (in addition to any other engineering fees) from the first 2,000 lots "developed or sold by the partnership to third parties." (g) That in the event the general partners could not agree, the problem would be submitted to arbitration. After the closing of the Kensington escrow on October 26, 1954, Berger was anxious to get LMDC activated. The engineering partnership and Freeland, as consulting engineer for LMDC, commenced applying for the necessary permits and talking with various *19 city departments in order to get necessary city approval. Freeland's engineering partnership was also employed by LMDC and performed various services for LMDC relating to on-site development and off-site improvements. On November 8, 1954, Freeland forwarded to the San Diego Planning Commission on behalf of LMDC a "Tentative Map Unit No. 1 [Lake Park Development Property]." Unit No. 1 consisted of approximately 50 acres to be subdivided into approximately 260-280 lots. Submitted at the same time were ten copies of a master plan map for the entire 4,500 acres and ten copies of a master plan map of the 800 acres subject to LMDC's 500-acre option. The master plan map of the 4,500 acres was an identical copy of that prepared for Kensington and Mrs. Waring on October 23, 1953, except that a portion of the lower right-hand section of that map had been cut out and a new section representing Unit No. 1 inserted. The map for the 4,500 acres indicated tentative locations for schools, parks, and supermarkets for the entire tract. It showed that, when fully developed, the 4,500 acres would yield an estimated 16,000 lots. As a result of discussions with representatives of SBIC and LMDC concerning *20 approval of the subdivision plan, the representatives of the San Diego Planning Commission understood that Unit No. 1 was the first unit in a planned development that would ultimately total 4,500 acres. On November 4, 1954, LMDC purchased 3.19 acres by a partial exercise of its 500-acre option. LMDC then commenced construction of seven model homes on this acreage. It was necessary for LMDC to bring off-site improvements to the Lake Park Property's southeast border in order to develop this acreage. In late December 1954, the seven model homes were completed and opened to the public for inspection. The advertising campaign referred to a "City of Tomorrow" to be developed on the 4,500 acres. Freeland, though he was aware of such advertising, disapproved of it and so informed Berger. On December 14, 1954, the City Council, on the recommendation of the Planning Commission, gave preliminary approval to the subdivision plan for Unit No. 1. Prior to December 23, 1956, LMDC, through its agent Freeland, submitted to the City Planning Department a tentative subdivision map for Units Nos. 2 and 3. Prior to January 17, 1955, LMDC similarly submitted a tentative subdivision map for Units Nos. *21 4 and 5. The size of the lots ranged between one-fourth of an acre and one-fifth of an acre. It was anticipated that 500 acres would produce between 2,200 and 2,400 lots. Units Nos. 1 through 5, if fully developed, would contain a total of approximately 3,000 lots and covered the 800-acre parcel on which LMDC had a 500-acre option. The City, in considering a tentative subdivision plan, was concerned, inter alia, with the location and adequacy of schools, parks, shopping centers, and off-site improvements, including adequate water supply. Though an immediate proposal might concern only a very small number of acres, the city considered the development in terms of overall plans for the surrounding area. The city would not permit wasteful duplication of facilities such as two small water reservoirs where one larger reservoir would be considerably more economical. Both Berger and Freeland represented SBIC in negotiations with the San Diego Unified School District pertaining to the granting of options for school sites within Units 1 through 5. On March 8, 1955, SBIC, through a letter signed by Berger, offered the School District school sites at a price equal to $2,000 per acre plus *22 "the average off-site cost for the entire 4,500 acres of approximately $200 per acre," plus the cost of on-site improvements. Additional land for park and recreational purposes was offered on the same terms. This offer was not accepted by the School District. On September 23, 1955, SBIC, through a letter signed by Berger, offered the School District, for $1 each, options on school sites within Units 1 through 5 at $1,900 per acre for usable land. SBIC also agreed to give the School District renewable options on specific sites of land selected by the School District on the remaining areas to be developed by SBIC. On July 26, 1955, the San Diego City Council adopted the Final Subdivision Map of College Ranch Unit 1, which map was filed and recorded in the County Recorder's Office on July 27, 1955. In July and August of 1955, LMDC partially exercised its 500-acre option and purchased an additional 146.93 acres from SBIC. LMDC then commenced development of Unit No. 1. LMDC also commenced the off-site improvement work for the 500-acre development. The principal aim in construction of these facilities was to provide adequate facilities for the 500 acres with minimum damage to the remaining *23 4,000 acres. In December 1954 or January 1955, a series of disputes arose between SBIC and LMDC. As a result of these disputes, LMDC and SBIC entered into an amended option agreement covering the 500 acres. The purchase price of the land was changed to $2,000 per acre for the first 250 acres and $1,800 per acre for all additional acreage. The "loan" of $200,000 by LMDC to SBIC was labelled a "credit," with LMDC entitled to recover any portion not used for off-site improvements, and no interest would be paid on the credit. LMDC's prior oral agreement to pay Freeland $25 per lot for his personal service and counsel was reduced to writing. The agreement also eliminated the lot and off-site improvement cost guarantees by SBIC. LMDC engaged in the construction of 196 homes. By the summer of 1955, LMDC developed financial difficulties. In an attempt to remedy the situation, Berger sought a change in the amended option agreement permitting LMDC to acquire what he thought would be more salable land. He proposed to develop land in the foothills of the mountain which would have a view of the lake. Employees of the engineering partnership prepared a feasibility study of the proposal, the *24 conclusion of which was that the cost of off-site improvements would be prohibitive at that time. Ultimately, LMDC was unable to overcome its financial difficulties. It became insolvent on May 4, 1956. LMDC assigned to Phoenix Insurance Company of Hartford all of its assets, except that it retained the right under the amended option agreement to purchase 200 acres of land out of the 500 acres originally covered by the option. Since LMDC had already exercised its option to the extent of approximately 150 acres, the portion of the option assigned to Phoenix only covered the right to purchase the remaining approximately 150 acres. Phoenix subsequently exercised this option. Berger was blamed for mismanagement of LMDC and was himself in financial difficulty. In August 1956, Carlos Tavares, representing a group of developers, including himself, apprached Berger and offered to purchase his interest in SBIC. Tavares had been one of the developers approached by Freeland at the time of the annexation of the 4,500 acres. On August 10, 1956, the Tavares group agreed to buy out Berger's interest and the respective 10 percent interests of the HAB Trust and the MLB Trust in SBIC for $950,000. *25 Berger did not get Freeland's consent for the sale of his interest in SBIC as required by the partnership agreement. Tavares then approached Freeland in an effort to purchase his interest in SBIC or, in the alternative, to have Freeland join the Tavares group in the development of the SBIC land. Freeland told Tavares he was not interested in joining in the development and decided to sell out. Lowthian decided to sell out her interest as well. Freeland received $730,000 for his interest, while Lowthian received $220,000 for hers. In agreement of sale, they consented to the purchase from Berger. During the taxable periods portions of the acreage were utilized for grazing and the raising of barley. The partnership reported gross income from these sources in 1955 of $10,467.99 against total expenses of $27,609.92 (of which $15,319.51 represented real estate taxes) and in 1956 of $17,958.50 against total expenses of $45,032.69 (of which real estate taxes represented $15,619.01). Freeland did not wish directly to engage in subdividing and developing the land, either individually or through any other business form, because it would place him in competition with his clients and those *26 of his engineering partnership and thus be financially injurious. At no time material hereto was either Freeland or Lowthian individually a dealer in real estate or individually holding real estate for sale to customers in the ordinary course of business. Although no improvements were made directly to the acreage not covered by the option to LMDC, the entire tract benefited from the off-site improvements made by LMDC. SBIC itself never directly advertised, promoted, or otherwise engaged in active efforts to solicit for its land, nor did it authorize anyone to undertake such activities directly on its behalf. Freeland, on behalf of SBIC, refused several unsolicited offers for the sale of portions of the acreage not covered by the LMDC option. SBIC never purchased any real property except the 4,500 acres here in issue. The only sales of real property ever made by SBIC, aside from the 300 acres acquired under the 500-acre option to LMDC, were (1) the sale of a fractional acre to the telephone company and (2) the sale of approximately four acres to the City of San Diego for a reservoir site as required by Kensington when SBIC purchased the land. The only other land transactions *27 of SBIC involved the grant to the San Diego School District of options to purchase sites within the area to be developed by LMDC for three elementary schools and one junior high school. SBIC also agreed to grant further similar options to the School District when development proceeded beyond the initial 500 acres. At the time of the annexation of the 4,500 acres, the city had required the then owners to agree to sell school sites within the property, and Kensington passed this obligation along to SBIC. Freeland and Lowthian reported gain on their sales of their partnership interests in SBIC on the installment basis as long-term capital gain. The tax as disclosed on the 1956 returns of Freeland and Lowthian was, respectively, $59,582.95 and $4,085.34. The respective deficiencies for 1956 were $93,332.32 and $10,231.29. Though each petitioner has agreed to certain of respondent's adjustments, the major portion of each 1956 deficiency represents the gain from the sale at issue in this case. During 1957, Internal Revenue Agent George Colling was assigned to audit the 1956 returns offreeland and Lowthian. Colling specifically questioned the propriety of capital gain treatment of the *28 sale of their respective interests in SBIC. SBIC's books and records were examined, as were many official city records. Colling concluded that Freeland and Lowthian correctly reported the gain from the sale of their respective partnership interests as capital gain. On September 19, 1958, the district director of internal revenue sent letters to Freeland and Lowthian accepting their 1956 returns, subject to adjustments not material herein. On April 26, 1962, the district director approved the reopening of petitioners' 1956 year "due to the amount of money involved and in the interest of being consistent" with the cases of the other partners in SBIC handled by another agent. On July 29, 1964, respondent issued his statutory notices herein asserting that the sale of the partnership interests resulted in ordinary income. The period of limitations had been extended beyond that date by appropriate consents executed by Freeland and Lowthian. Ultimate Finding of Fact SBIC held the land in question primarily for sale to customers in the ordinary course of its trade or business. Opinion Although the transaction taxable herein was the sale of a partnership interest, the parties are *29 in agreement that the ultimate resolution of the controversy between petitioners and respondent depends upon whether the land in question is excluded from the definition of a capital asset on the ground that it was held by the partnership (SBIC) "primarily for sale to customers in the ordinary course of [its] trade or business." Sections 1221(1), 741, and 751. [3] Petitioners concede that the land meets the "substantially appreciated" requirements of section 751. The issue thus presented has been described as an "old, familiar, recurring, vexing, and often elusive problem." See Thompson v. Commissioner, 322 F. 2d 122, 123 (C.A. 5, 1963). Understandably, there are no hard and fast rules; each case must turn on its own facts. We see no need to repeat the facts herein at length; they are set forth in detail in our findings. It is sufficient for us to note the broad ground rules under which we have approached the critical issue and the salient facts upon which our decision is founded. We start with the statutory requirements. *30 Section 1221(1) has several elements: (1) The property must be held "primarily for sale." [Italics added.] Petitioners have sought to convince us that the use of the land by SBIC for grazing and farming was sufficient to constitute this activity "of first importance" so as to require a holding that the land was not held primarily for sale. We do not agree. We are satisfied that, even though such activity constituted a business for certain tax purposes, it did not achieve a status sufficient to satisfy the "primarily" element of the statute. Malat v. Riddell, 382 U.S. 900 (1966). Such being the case, we need not concern ourselves with the question of dual purpose which Malat sought to resolve. Similarly, the record shows clearly that the plans of SBIC at the time of acquisition of the property continued to govern its subsequent activities so that we are not faced with a situation involving a change of purpose. See, e.g., Todd Tibballs v. United States, 362 F. 2d 266 (Ct. Cl. 1966). (2) The property must be held "for sale to customers." We think it clear that SBIC held the land in question for ultimate sale to eventual customers, but this conclusion *31 does not preclude a finding that the land represented an investment. Even an investor holds his property for eventual sale and the persons who ultimately purchase directly from him are his "customers." [4] For this reason, the positive characterization of a particular holding as an "investment" is sometime misleading. The real significance of the characterization lies in its negative implication, namely, that the property was not held "for sale to customers in the ordinary course of * * * business." [Italics added.] (3) The customers must be "in the ordinary course of his trade or business." We think this is the critical phrase. See W. T. Thrift, Sr., 15 T.C. 366, 371 (1950). Thus, the taxpayer must be engaged in a business during the ordinary course of which selling to customers is *32 or will be a part. In determining whether this element of the statute has been satisfied, we look to the totality of the taxpayer's plans and activities in an effort to determine his overall program with respect to the property. We next move to a consideration of what SBIC itself planned to do with the property. Respondent emphasizes thatberger was a well-known developer and that Freeland was well aware of this and of Berger's aggressiveness in promoting the affairs of SBIC. Petitioners counter with the assertion that a developer can also be an investor and explain away many of Berger's assertions on the grounds that he was a chronic liar (which we are inclined to believe he was) and that he indulged in untruths and overzealous "puffing" in order to obtain the necessary cooperation from third parties. They assert that Berger's statements in fact did not represent the true intentions of either Berger or SBIC. We are not prepared to conclude, as respondent seems to suggest, that a person is necessarily "like the company he is wont to keep." Euripedes, Phoenix, Fragment 809. Freeland is not totally tarred with Berger's brush. Nevertheless, we do not think that Freeland can completely *33 escape from the known predilections and admitted activities of his partner. We adopt a similar attitude with respect to certain language in the partnership agreement, in the agreements between SBIC and LMDC relating to the sale and development of 500 acres, in the General Petroleum letter, and in documents and other records of governmental units of the City of San Diego - language which respondent asserts is of critical significance and which petitioners seek to explain away as reflecting the ineptness of the lawyers, carelessness on Freeland's part, or the inaccurate understanding of the situation on the part of third parties. We think it clear that SBIC did not itself intend to develop the 4,500 acres - such action would have been damaging to Freeland's professional activities and those of his engineering partnership. But it is equally clear that the ultimate success of the venture, upon which SBIC had embarked, was dependent upon insuring the development of the acreage by someone. That this was the case is indicated by the fact that Kensington inserted in its agreement with SBIC a requirement that SBIC deposit $200,000 in escrow for off-site improvements. This is a peculiar requirement *34 for a seller to impose in a mere sale of raw acreage. Granted that such sum would not cover off-site improvements for the entire 4,500-acre tract, the imposition of such requirement mirrors the vision of development which the parties, including SBIC, had in mind. The same inference can be drawn from the payment schedule in the Kensington-SBIC arrangements. The lower payments in the earlier years seem to us more likely to reflect the understanding of the parties that development would be the generating source of the funds rather than, as petitioner suggests, the desire of SBIC to hold down the amounts required to be paid until it had had an opportunity to realize on the anticipated appreciation in value. Many of the various words and phrases in the agreements, memoranda, and documents deal with the overall vision of future development and do not deal with the real question herein - namely, what role was SBIC or its partners to play in that development? Accordingly, we believe that the particular language to which so much of the argument of the parties has been directed is entitled only to peripheral weight. [5]
*35 What, then, was the role which it was anticipated SBIC or its principal partners would play in the contemplated development of the 4,500 acres? Petitioner contends that any such role was to be passive, drawing support for such contention from the facts that the partnership had a 10-year term, that Freeland had a veto power over decisions involving partnership policy, and that Freeland chose to sell out to Tavares rather than join in the active development of the property: We do not think that any of these elements has any real bearing on SBIC's role. A 10-year term for the partnership is not unusual under the circumstances since, if the rate of development by LMDC is taken as a barometer, it would take this amount of time to complete substantial development of the tract. The veto provision is a normal provision in a partnership, particularly where there are two general partners. It could have had as its purpose simply protection to Freeland respecting the price at which the land was sold. Even without such a provision, it is likely that any purchaser of the land would, as a practical matter, have required the signatures of both Freeland and Berger, as general partners, to any contract *36 or deed. Freeland's unwillingness to join Tavares in active development does no more than confirm his unwillingness to engage in open competition with clients of his engineering partnership. It does not operate to erase a pattern of concealed participation in development through an appropriate screen such as LMDC. Nor do we attach any significance to Freeland's sketchy and general testimony that all offers to purchase acreage were summarily refused because he did not wish to sell. For aught that appears, his refusal could have been based on his desire that the partnership carry out its planned program of disposition. We think the answer to the question of the role which SBIC or its principal partners was to play in development lies in the plans and operations of LMDC and its arrangements with SBIC. We agree with petitioner that the fact that SBIC promptly sold acreage to LMDC is not conclusive. We do not, however, agree that the agreement between SBIC and LMDC merely served to assure the receipt of payments by SBIC sufficient to cover the discharge of SBIC's obligations to Kensington during the early years. [6] We cannot overlook the fact that LMDC had only an option which it was *37 not required to exercise. Admittedly, the requirement of a deposit of $200,000 for off-site improvements, which was imposed on LMDC, provided economic pressure on LMDC to exercise the option. It is apparent to us, however, that Berger and the Barenfeld-Glaser Group, all of whom were partners in SBIC, had substantial interests in LMDC, although the precise extent of these interests was never established. These interlocking participations provided the real guarantee that the option would be exercised. The original option agreement contained extensive provisions whereby SBIC guaranteed to LMDC that the cost of off-site improvements would not exceed $200,000 and that the cost of the homes to be constructed and sold would not exceed fixed amounts. These guarantees were eliminated *38 in the modified agreement concluded some months later, but their elimination stemmed from disputes arising out of the working relationships between SBIC and LMDC rather than, as petitioner suggests, an attempt to eliminate undertakings which had been erroneously included in the first place. Such undertakings are unusual on the part of a pure seller of acreage and are indicative of a plan for the partners of SBIC to be involved in active development. A further indication of SBIC's involvement in the development activities of LMDC is contained in the price at which acreage was sold to it by SBIC. The purchase from Kensington and the grant of the option to LMDC took place at the same time. Yet, LMDC was required to pay $2,000 per acre although SBIC acquired the land from Kensington at $1,037 per acre ( $800 plus interest). The discrepancy in price is substantial. We recognize that a small portion of the discrepancy may reflect the fact that some of the acreage would be devoted to public purposes such as streets, parks, etc. Perhaps the acreage sold by SBIC to LMDC was more valuable than other portions of the total tract. Petitioners did not see fit to enlighten us on these scores. In *39 our view, the circumstances strongly suggest that the price was arbitrarily arrived at as a method of siphoning off to the common participants in SBIC and LMDC a portion of the latter's profit hopefully as long-term capital gains. [7] In this connection, we note that, while Freeland did not have an ownership participation in LMDC, he could reap his financial reward from that entity via direct personal engineering fees and fees paid to his engineering partnership. *40 The off-site improvements which were to be provided out of the $200,000 deposited by LMDC not only were for the direct benefit of the initial 500-acre tract but also benefited indirectly the remaining acreage. We recognize that mere efforts on the part of a land investor to construct, or assist in constructing, improvements which would enhance the value of his holding will not necessarily constitute a curse from which there is never an escape. Cf. Morris Cohen, 39 T.C. 886 (1963), acq. 1965-2 C.B. 4; see Malat v. Riddell, - F. Supp. - (S.D.Cal. 1966), conclusion of law No. 3. But the indirect element is another factor to be considered in determining the mosaic of SBIC's plans. Petitioners' arguments either ignore or minimize the foregoing considerations. They hew to the line that, measured by the tests normally applied to cases of this kind, SBIC was merely a passive investor in the property. These tests, which have been frequently delineated by the courts, include "the purpose or reason for the taxpayer's acquisition of the property and in disposing of it; the continuity of sales or sales-related activity over a period of time; the number and frequency *41 of sales; the extent to which taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of the sales when compared to other sources of taxpayer's income." See, e.g., James G. Hoover, 32 T.C. 618, 625 (1959). If we were to construct a "cordon sanitaire" around the activities of LMDC, petitioners would indeed be in a strong position. But this we are not prepared to do. Nor do we think it material that petitioners realized a substantial profit on their bulk sale to Tavares approximately two years after the venture started. Changed circumstances do not automatically erase the effect of a proposed course of action which would otherwise exist, nor does the fact that the tract was sold "in bulk" operate to change the purpose of the partnership in holding the land. Cf. Donald J. Lawrie, 36 T.C. 1117 (1961); Julius Goodman, 40 B.T.A. 22 (1939). The normal criteria are not the exclusive benchmarks for decision in a case such as this, where there were good reasons *42 for indirect as opposed to direct participation in development activities and where the period of gestation was prematurely cut short. We think that, from the beginning, the partners in SBIC intended to sell off the property as quickly as the area could be made ready for development and that to this end they planned actively and continuously to participate in sequential development efforts. LMDC was the primer for the entire project. It was the first vehicle to be utilized and the partners of SBIC were deeply involved in the activities of that entity. Cf. Ackerman v. United States, 335 F. 2d 521 (C.A. 5, 1964). Respondent suggests that LMDC was to be the sole vehicle of the partners, transferring its activity from one segment of the tract to the next as soon as the development of the previous segment was completed. We do not find it necessary to go that far. It is enough for us to say that the partners would seek constantly to construct vehicles for development, in which they would probably participate in one form or another, in order to be in a position to sell the acreage involved in slices of varying sizes as promptly as possible. Alternatively, they were ready to *43 sell at any time that the partnership received acceptable offers. Cf. James E. Kesicki, 34 T.C. 675 (1960). We are not unmindful of the fact that Freeland steadfastly maintained in his testimony that neither he nor the partnership had any plan such as we believe existed. We do not doubt the sincerity of his testimony at the time he gave it but there is too much other evidence which requires explanation. Just as we will not completely ignore Berger's statements and actions, we will not accept Freeland's testimony as gospel. It seems inescapable to us that his testimony reflected no more than that the wish was the father to the thought. The boundaries of this case are beyond the permissible limits established by United States v. Rosebrook, 318 F. 2d 316 (C.A. 9, 1963), Todd Tibbals v. United States, supra, [8]Morris Cohen, supra, and Katherine Anne Berryman, 37 T.C. 45 (1961), relied on by petitioners. Cf. Broughton v. Commissioner, 333 F. 2d 492 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court. No one factor in the instant situation is determinative. Rather it is the totality of all *44 the factors and our view of the entire record which impels us to conclude that SBIC was holding the land in question "for sale to customers in the ordinary course of [its] trade or business" of actively and continuously participating in the development and sale thereof. One final issue remains. Petitioners contend that respondent abused his discretion in reopening petitioners' 1956 tax returns. Petitioners rely on Rev. Proc. 59-25, 19 59-2 C.B. 938, 939, [9] for their position, which states in pertinent part: It is the administrative practice of the Internal Revenue Service not to reopen cases previously closed by the District Director unless there has been substantial error, both in amount and in relation to the total tax liability, or there is evidence of fraud, malfeasance, collusion, concealment or the misrepresentation of a material fact. *45 Petitioners state correctly that neither fraud, malfeasance, collusion, concealment, nor the misrepresentation of a material fact is involved so that respondent's grounds must be the provision as to substantial error. Petitioners argue that, since all dealer-in-vestor questions, and in particular the question in the instant case, are close questions, it follows that there was no substantial error. Petitioners' error lies in a failure to note that the Revenue Procedure is concerned only with certain types of "substantial error," that is, "both in amount and in relation to the total tax liability." The deficiencies assessed against Freeland and Lowthian for 1956 are, respectively, $93,332.32 and $10,231.29, whereas the tax as disclosed by each return for 1956 is, respectively, $59,582.95 and $4,085.34. Thus, both elements of the substantial error test of Rev. Proc. 59-25 have been met. It would be paradoxical if "substantial error" were to depend upon the analysis of the closeness of the very question which the court is called upon to decide. Beyond the foregoing, we note that petitioners kept their returns open by voluntarily executing consents extending the period *46 of limitations. They do not contend that any of these consents were invalid or that the period of limitations had otherwise run. The letter of respondent indicating the favorable disposition of the issue involved herein was dated September 19, 1958, and the case was not reopened until April 26, 1962, more than three-and-a-half years later. The petitioners had ample opportunity to protect themselves against the alleged abuse of discretion and the burden of interest about which they now complain. We find respondent has not abused his discretion. [10]
Decisions will be entered for the respondent. Footnotes
1. Vera is a party to this proceeding only by reason of having filed joint returns with Eugene. Accordingly, any reference here to "Freeland" will be deemed to refer to Eugene.↩
2. Referred to as "MPB" Trust in certain of petitioner's exhibits. The initials "MLB" were used to refer to the trust in the stipulation.↩
3. All references are to the Internal Revenue Code of 1954.↩
4. The legislative history of the predecessors of section 1221(1)↩ indicates clearly that the word "customers" was inserted to require capital asset treatment of property, such as securities, traded through brokers on the taxpayer's own account. Revenue Act of 1934, sec. 117(b). S. Rept. No. 558, 73d Cong., 2d Sess., p. 12 (1934); H. Rept. No. 1385, 73d Cong. 2d Sess., p. 22 (1934).
5. One of the hotly disputed documents at the trial was a memorandum of promises to Freeland allegedly broken by Berger (Exhibit U). Petitioner, on brief, concedes Freeland's authorship but contends that it was only a rough draft containing inaccurate statements. We think that the document itself sheds little light on the issue involved herein and, accordingly, have accorded no weight to it. Similarly, we think that the extensive argument as to whether the master plan for the entire tract was filed during the course of earlier annexation proceedings or during the course of the efforts to obtain approval of LMDC's plans herein to subdivide has no bearing on the basic question of SBIC's role.↩
6. Petitioner alleged that SBIC had no personal liability to Kensington. We do not think that this element, even if it were the fact, has any bearing on the issues involved herein. We are constrained to note, however, that there is no indication in the Kensinggton escrow instructions that SBIC's liability was to be limited to the security; we were not favored with a copy of the actual note executed by SBIC.↩
7. A countervailing consideration may be reflected in the fact that the options for school sites fixed a price of $1,900 per acre. But the record is silent as to whether the school district exercised any of these options or in any way indicated that the option price was acceptable. SBIC completed its purchase from Kensington on October 26, 1954. Except for 3.19 acres as to which LMDC exercised its option on November 4, 1954, its acquisition of additional acreage did not occur until more than six months subsequent to October 26. SBIC reported long-term capital gain from the sales to LMDC in 1955 and 1956, allocating a cost basis of approximately $1,905 per acre. Certain adjustments were made by respondent to the partnership income for those years to which petitioners have agreed. We were not informed as to the nature of these adjustments, and in particular whether they dealt with SBIC's treatment of the profit as long-term capital gain. In any event, the tax treatment of the sales by SBIC to LMDC is not at issue herein.↩
8. See also the related case of Charles E. Tibbals, T.C. Memo. 1958-44↩.
9. Rev. Proc. 59-25 was superseded by Rev. Proc. 63-9, 1963-1 C.B. 488, which in turn was superseded by Rev. Proc. 64-40, 1964-2 C.B. 971↩.
10. We note that petitioners' position carries the implication that notification of adjustment of liability and acceptance thereof by the taxpayer should be accorded the status of a closing agreement with respect to which sec. 7121 imposes specific requirements. Cf. The Cleveland Trust Co., Exr. v. United States, - F. Supp. - (N.D. Ohio, Nov. 29, 1966).↩