**Max R. GINSBURG and Ruth Ginsburg**

v.

**The UNITED STATES.**

**Allen R. BALTON and Dorothy Balton**

v.

**The UNITED STATES.**

**Nos. 70-65, 73-65.**

United States Court of Claims.

June 14, 1968.

George T. Altman, Beverly Hills, Cal., attorney of record, for plaintiff.

Michael I. Saltzman, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

DAVIS, Judge.*

This is our second trek into the thicket of transactions that flourished around the Sam Berger Investment Company in southern California from 1954 to 1958. We drew a detailed map of this tangle in the earlier suit, Morse v. United States, 371 F.2d 474, 178 Ct.Cl. 405 (1967), motion for reconsideration denied this day, and the findings in the current cases (which were joined for trial) indicate that plaintiffs Ginsburg and Balton took,

* We are indebted to Trial Commissioner Mastin G. White for his memorandum opinion submitted under the order of reference and Rule 57(a).

for present purposes, the precise path that Morse did.[1] The by-ways and dead-ends are sketched in the *Morse* opinion; here we keep rigidly to the one re-traveled road.

As in *Morse* these plaintiffs' petitions raise the following issues: (1) the character of the gain plaintiffs realized on the sale of their partnership interests in Sam Berger Investment Company;[2] (2) the taxability as ordinary income of monies which plaintiffs received pursuant to the settlement of a lawsuit which plaintiffs (along with others) had instituted against Sam Berger; (3) the deductibility, as ordinary business expenses, of payments made to the Phoenix Insurance Company under a guarantee plaintiffs had given with respect to the operation of the Lake Murray Development Company, of legal fees paid in connection with that transaction, and of expenses incurred on the sale of their interests in a land option; and (4) the taxability as ordinary income of the amounts which plaintiffs received on the sale of that option.[3]

Our decision in *Morse* was favorable to that taxpayer on the first and fourth of these issues, but not on the other two. In the present cases, the trial commissioner concluded that the additional evidence did not warrant a different conclusion on any of the questions. The plaintiffs have fully accepted the commissioner's stand, and the defendant has excepted only to the characterization of the gains realized when plaintiffs sold their partnership interests. We confine our discussion to that point. Further, we elaborate on *Morse* only to the extent necessary to take account of the Ninth Circuit's recent decision relating to another of the Sam Berger Investment Company partners, Estate of Freeland v. Commissioner of Internal Revenue, 393 F.2d 573 (C.A. 9, March 1968, rehearing

denied May 6, 1968), affirming 25 T.C. M. 1473, ¶ 66,283 P–H Memo T.C. (1966), and to deal with the one argument which the Government presses here but did not raise before the court in *Morse*.

To recapitulate the pertinent facts— In 1954 a limited partnership, the Sam Berger Investment Company (SBIC), was formed with the interests and management authority divided as follows: Sam Berger (twenty percent) and E. L. Freeland (thirty-two percent) were general partners; the HAB Trust (ten percent), the MLB Trust (ten percent), Margaret Lowthian (eight percent), and the Lake Murray Trust No. 1 (twenty percent) were limited partners. Through the settlement of a lawsuit concerning the Lake Murray Trust No. 1 and the Lake Murray Development Company, both of the present plaintiffs (i. e., the husbands) acquired, in 1956, a .723 percent interest in SBIC (as did Morse).

The principal asset of the partnership was a plot of 4500 acres of land in San Diego County on which the partnership, with numerous disputes and little success, allegedly sought from 1954 to mid-1956 to develop housing subdivisions. The partnership also, after acquiring the land, supervised the planting and harvesting of barley on a portion of it.

The partnership agreement prohibited both limited and general partners from selling, assigning, or transferring their partnership interest to any person other than another partner, and further provided that "it is specifically understood and agreed that neither partner, general or limited, may sell, assign, transfer, convey, hypothecate nor encumber his interest nor any part thereof in this partnership without the written consent of both general partners." However, Sam Berger contracted on August 10, 1956, to sell his twenty percent share,

1. Neither side suggests that the new evidence differentiates these cases from *Morse*.

2. As indicated infra the Government contests the contention that plaintiffs sold

partnership interests rather than shares of distributed partnership assets.

3. This issue was raised by the defendant's affirmative defense. Plaintiffs have been assessed at capital-gain rates and wish to retain that treatment.

along with the ten percent shares he had acquired from the HAB and MLB trusts of which he was trustee, to a group of individuals known as the Tavares group; and on November 26, 1956, E. L. Freeland and Margaret Lowthian similarly agreed to sell their interests to Tavares. None of the selling partners obtained the consent of the other partners before contracting with Tavares. On October 31, 1957, the Tavares group purchased the interests of the remaining partners (including the present plaintiffs and Morse), and at the same time received their consent to the prior contracts.

From August 10, 1956 (when Berger agreed to sell to the Tavares group) to October 1957, no development work was performed by SBIC on or in connection with the land, none of its land was sold, and no obligation or indebtedness was incurred by the partnership. SBIC, through hired hands, did continue the barley-farming operations.

In *Morse* the Government's argument was that the gain the taxpayer realized from the sale of his partnership interest was "attributable to * * * inventory items of the partnership which have appreciated substantially in value" and therefore had to "be considered as an amount realized from the sale or exchange of property other than a capital asset." Int.Rev.Code of 1954, § 751(a). On examining this issue—a question of fact—we concluded that, when Morse sold his interest[4] in October 1957, the realty was not then being held by the partnership as inventory (i. e., it was not held "primarily for sale to customers in the ordinary course of [its] trade or

business," Int.Rev.Code of 1954, § 1221 (1)), and, therefore, that Morse realized a capital gain by virtue of Int.Rev.Code of 1954, § 741.[5]

We found it unnecessary to decide the land's character prior to August 10, 1956 (the date of the Berger sale), and indicated that "it might be proper" to treat it as inventory at that time because of the "interlocking relationship" among SBIC, the Country Club Park joint venture, and the Lake Murray Development Company (both of the latter were "actively engaged" in developing the partnership land). 371 F.2d at 481, 178 Ct. Cl. at 417–419. It was our view that, no matter what the business of the partnership prior to the August date, the preponderance of the evidence indicated that all the problems and circumstances leading up to, and including, Berger's contract of sale induced the partnership to give up its plans for developing the land and instead to continue to hold it but as investment property.

The Government, whose evidence and contentions with respect to Section 751 are virtually the same as in *Morse,* has not persuaded us that, on the facts, we were wrong there. But we are told that *Morse* is contrary to the Ninth Circuit's opinion in Freeland v. Commissoner of Internal Revenue, supra, 393 F.2d 573, affirming 25 T.C.M. 1473, ¶ 66,283 P–H Memo T.C., and that we should not allow such a conflict to persist.

We find nothing in *Freeland* essentially at odds with our decisions in *Morse* and the present cases. The court of appeals' affirmance of the Tax Court determination that the purpose for which

---

4. We treat this issue on the assumption that plaintiffs did sell a partnership interest, since we decide infra that the Government is incorrect in asserting that the partnership was terminated no later than November 1956 under Section 708 (b) (1) and that the land was distributed at that time—points which it did not raise in *Morse*—and that the plaintiffs sold their portions of the distributed land (rather than their partnership interests) in October 1957. See the discussion of Section 708 infra.

5. "§ 741. *Recognition and character of gain or loss on sale or exchange*
  "In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value)."

SBIC held the land did not change prior to November 26, 1956 (when Freeland and his business secretary, Margaret Lowthian, contracted to sell their interests) was based on its inability to "conclude that it was 'clearly erroneous' for the Tax Court to find that the partnership's purpose had not changed." 393 F.2d at 584. It said: "We cannot hold as a matter of law that that purpose *must* have changed." Ibid. (original emphasis).[6] At the same time, the court pointed out that the Tax Court could probably have reached the opposite conclusion (393 F.2d at 584):

> Petitioners' contentions admittedly are not wholly without support. There perhaps would have been some basis for a finding that SBIC's original purpose changed * * *. It is quite conceivable that, particularly after the failure of [the Lake Murray Development Company] and the entry into SBIC of Tavares (who wanted to develop the land directly), SBIC's "purpose" regarding the land was to some degree not clearly defined.[7]

In short, assuming that the records in *Morse* and *Freeland* are identical, the difference in results is simply a reasonable disagreement between two triers of the facts in appraising the evidence. Though unfortunate perhaps, the different tax consequences for Morse and the present plaintiffs, on the one hand, and Freeland and Lowthian, on the other, are the result of the various taxpayers having had their rights adjudicated in two different forums, each of which has primary fact-finding responsibilities. This is not a sufficient reason for us to abandon what we consider the correct—though not necessarily the only reasonable—conclusion. In fulfillng our judicial obligation, we have merely evaluated the facts differently than the Tax Court did in pursuit of its responsibility.[8]

We are not at all sure that we even have a real difference with the Tax Court on the change-of-purpose point. First, we do not know whether the pertinent evidence before us in *Morse* (and here) was all before the Tax Court in *Freeland*. Second, if the change-of-purpose theory was presented to that court, it seems—as the court of appeals noted (393 F.2d at 583 n. 2)—to have been an afterthought, not articulated as it was when *Morse* reached this court. The Tax Court's introductory statement that "we are not faced wth a situation involving a change of purpose" (25 T.C.M. at 1480, ¶66,283 P-H Memo T.C. at 1651) indicates that those taxpayers did not make an effort to compile a record in support of the point. They seem rather to have hinged their argument on the fact, viewed in isolation, that they "realized a substantial profit on their bulk sale to Tavares." 25 T.C. M. at 1482, ¶66,283 P-H Memo T.C. at 1654.

Our *Morse* opinion does not contradict the Tax Court's correct retort that "the

---

6. On the same ground, it upheld the Tax Court's finding that the partnership's acquisition of the land was motivated by a desire to develop it into subdivisions. As to this issue the court of appeals concluded that the "Tax Court might possibly have properly found in the petitioners' favor." 393 F.2d at 583.

7. This quotation incorporates changes made in the Ninth Circuit's opinion by its Order on Petition for Rehearing, dated May 6, 1968.

8. The defendant also argues that our decision results in an unfair discrimination against Sam Berger. Assuming (though it is not clear) that Berger's gain on the sale of his partnership interest to the Tavares group would be ordinary income under Section 751 because it was attributable to substantially appreciated inventory property, we see no unfairness in holding that other partners are entitled to capital-gains treatment because they sold their interests *after*—in the case of the taxpayers in this court, considerably after—the purpose for which the partnership held the property had changed. The reverse could also happen. Suppose Berger sold at a time when the partnership held land for investment, but shortly thereafter it decided to develop the land. In that case, Berger would receive the tax "break".

fact that the tract was sold 'in bulk' [does not] operate to change the purpose of the partnership in holding the land." 25 T.C.M. at 1482, ¶66,283 P-H Memo T.C. at 1654. Nor do we disagree with the court of appeals' response (to the more extensive change-of-purpose argument presented there) that a court should be "wary" of finding that "because of a lack of business success, the purpose for which property is held by a partnership changes from one of sale to customers to one of investment", and that the Congressional purpose to prevent parties from converting ordinary income into capital gain "would in many instances be frustrated if partners' decisions to sell their interests *necessarily* sufficed to establish the sort of 'change of purpose' which petitioners contend occurred here" (emphasis added). 393 F.2d at 584, as amended by Order on Petition for Rehearing, May 6, 1968.

*Morse* is based on the conclusion that "all the circumstances" there (not just an intent to "liquidate" or a "bulk sale" alone) show that some time after August 10, 1956, the partnership "completely lost its original purpose" and that "the land was being held for its appreciation in value, and not for sale in the ordinary course of trade or business." 371 F.2d at 481–482, 178 Ct.Cl. at 418. That was a factual conclusion, not the promulgation of a rule of law, and one of the factors on which the determination rested was that Morse (and the present plaintiffs) held on to the property until October 31, 1957, hoping to get as much for their interests as they could. Freeland and Lowthian, on the other hand, sold out a year earlier, in November 1956, a much shorter time after Berger's sale in August 1956. Possibly that distinction in facts could be crucial.

In its argument in the present cases the Government has added a new argument based on Int.Rev.Code of 1954, § 708[9]—a point not used in *Morse*, or, apparently, made to either the Tax Court or the court of appeals in *Freeland*. The Government's new theory is this: (i) Sam Berger Investment Company was terminated, as a matter of law, by Section 708(b) (1) for tax purposes sometime in August or November of 1956, and at that time the partnership property was held as inventory; (ii) upon this constructive termination, each partner received a constructive share of the partnership property, and the plaintiffs sold that property, not partnership interests, in October 1957; (iii) by Section 735(a) (2) of the 1954 Code,[10] distributed inventory property retains its character if the distributee partner sells it within five years from the date of distribution, regardless of his reason for holding it in the interim; and (iv) therefore, the gains realized by plaintiffs when they sold the constructively distributed inventory property in October 1957 were ordinary income.

The obvious goal of this hypothesis is to surmount *Morse* by rolling back the date for determining the character

9. "§ 708. *Continuation of partnership*
"(a) *General rule.*—For purposes of this subchapter, an existing partnership shall be considered as continuing if it is not terminated.
"(b) *Termination.*—
(1) General rule.—For purposes of subsection (a), a partnership shall be considered as terminated only if—
(A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or
(B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits."

10. "§ 735. *Character of gain or loss on disposition of distributed property*
"(a) *Sale or exchange of certain distributed property.*—
\* \* \* \* \*
(2) Inventory items.—Gain or loss on the sale or exchange by a distributee partner of inventory items \* \* \* distributed by a partnership shall, if sold or exchanged within 5 years from the date of the distribution, be considered gain or loss from the sale or exchange of property other than a capital asset."

of the property to one on which it is more likely that we would hold the realty to have been inventory. We find it unnecessary to test the successive steps since we believe that the initial one— that there was a Section 708 termination before the property was sold by present taxpayers in October 1957—is unsound.

Subparagraph (A) of Section 708(b) (1) provides that a partnership is terminated if *"no part* of *any* business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership" (emphasis added). There is nothing to indicate that this provision requires less than what it says—a complete cessation of all partnership business—and therefore we cannot accept the Government's contention that a partnership is terminated if it abandons just its "primary purpose." See David A. Foxman, 41 T.C. 535, 557 (1964), aff'd, 352 F.2d 466 (C.A.3, 1965) (no termination even though "these items were of comparatively minor character in contrast to the enterprise previously carried on"); James v. United States, 63–1 U.S.T.C. ¶9478, at 88307, 88309 (M.D.Ga.1963); cf. Treas.Reg. § 1.708–1(b) (1).

Though development activities on the land held by the partnership ceased about the time Sam Berger agreed to sell his interest to the Tavares group (August 10, 1956), the partnership continued to engage in barley-growing operations on it. See finding 19.[11] This blocks the defendant's attempt to have us judge the plaintiffs' gain on the basis of the character which the partnership property had on August 10, 1956, or in November 1956. Furthermore, the fact that the partnership continued to hold the property for a business purpose—investment —might well be an adequate showing that it was not sufficiently inoperative to evoke the termination provision of Section 708(b) (1) (A).[12]

The other subparagraph of 708(b) (1) terminates a partnership if "within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits." This provision was not, of course, triggered by the Berger contract, and the defendant does not contend that

11. The Government has belatedly argued that the evidence does not show that the partnership was really carrying on farming activities after August 1956 and that, if the court considers the matter important, the case should be remanded to the trial commissioner for further evidence. As we read the commissioner's finding 19, SBIC farmed the land continually from the time it was acquired on through all relevant periods. There is testimony from E. L. Freeland that, at the time he sold his interest in November 1956, the partnership was carrying on the raising of barley, and it can be assumed that this continued for some time. See, also, Eugene L. Freeland, supra, 25 T.C.M. at 1478, ¶66,283 P-H Memo T.C. at 1650. There is no need for further evidence.

12. The Government intimates that Section 708(b) (1) (A) terminates a partnership which no longer meets the definition of "partnership" in Section 761(a) and Treas.Reg. § 1.761–1(a). Even if this is true, SBIC in the period from August 1956 to October 1957 could fit within the first sentence of Section 761(a), which uses the phrase "any business, financial operation, or venture," and the regulation would not necessarily exclude it. (The remainder of the statutory subsection deals with the circumstances under which a partnership, as defined by the first sentence, may elect exclusion from the requirements of the partnership subchapter.) However, since Section 708, quoted in note 9 supra, provides that an "existing partnership" is considered terminated "only if" either subparagraph (A) or (B) applies and since Congress added Section 708 to the 1954 Code without a cross-reference to Section 761 (which was substantially carried over from the 1939 Code) and without copying the language of that section, it may well be that the issue of terminating an existing partnership is to be evaluated solely on the basis of Section 708 without regard to whether the "organization" of individuals involved, if judged *ab initio*, would be considered a partnership under Section 761(a). For similar reasons, Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 740, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949), and Gilford v. Commissioner of Internal Revenue, 201 F.2d 735, 736 (C.A.2, 1953), could be considered inapposite.

it was, since Berger agreed to sell only a forty percent interest (his own twenty percent interest plus the two ten percent interests acquired from the HAB and MLB trusts). The defendant does argue that a termination occurred when, three months after the Berger sale, Freeland and Lowthian signed contracts, in November 1956, on their combined interests of forty percent. The plaintiffs have replied, among other arguments, that the 50-percent provision cannot be used to show that the partnership terminated at that time because the other limited partners' consent to the prior sales, required by the partnership agreement,[13] was not obtained until the remaining partners disposed of their interests in October 1957.

We accept this position. The Freeland and Lowthian sales were not validated until October 1957, and therefore were not effective within the 12-month period stipulated by Section 708(b) (1) (B). Since there is no hint of collusion or evasion in the failure to obtain all the partners' consent in a year's time, there is no ground for considering these inchoate sales as final and valid for tax purposes despite the absence of the essential consent. The result is that Section 708 is inapplicable because neither of its conditions for termination of a partnership has been met in these cases.[14]

We conclude that plaintiffs, like Morse, are entitled to capital-gain treatment of the proceeds of the sales in October 1957, and therefore can recover on that claim. For the reasons stated in *Morse*, plaintiffs are denied recovery on the other two claims stated in their petitions and the Government's affirmative defense is not sustained.

13. The agreement did not say explicitly that limited partners had to consent to sales of partnership interests, but it did provide that partners could sell only to other partners, and the partners consistently treated the agreement as requiring the consent of all partners to a sale to outsiders. The defendant does not argue otherwise.

14. We add that, in any event, we tend to the view, though we need not decide definitively, that the defendant has not given us a convincing reason for concluding that the property was held by the partnership as inventory on November 26, 1956, when Freeland and Lowthian sold their shares.