Davis, Judge,
delivered the opinion of the court: *
This is our second trek into the thicket of transactions that flourished around the Sam Berger Investment Company in southern California from 1954 to 1958. We drew a detailed map of this tangle in the earlier suit, Morse v. United States, 178 Ct. Cl. 405, 371 F. 2d 474 (1967), motion for reconsideration denied this day, and the findings in the current cases (which were joined for trial) indicate that plaintiffs Ginsburg and Balton took, for present purposes, the precise path that Morse did.[1] The by-ways and dead-ends are sketched in the Morse opinion; here we keep rigidly to the one re-traveled road.
As in Morse these plaintiffs’ petitions raise the following issues: (1) the character of the gain plaintiffs realized on *447 the sale of their partnership interests in Sam Berger Investment Company;[2] (2) the taxability as ordinary income of monies which plaintiffs received pursuant to the settlement of a lawsuit which plaintiffs (along with others) had instituted against Sam Berger; (3) the deductibility, as ordinary business expenses, of payments made to the Phoenix Insurance Company under a guarantee plaintiffs had given with respect to the operation of the Lake Murray Development Company, of legal fees paid in connection with that transaction, and of expenses incurred on the sale of their interests in a land option; and (4) the taxability as ordinary income of the amounts which plaintiffs received on the sale of that option.[3]
Our decision in Morse was favorable to that taxpayer on the first and fourth of these issues, but not on the other two. In the present cases, the trial commissioner concluded that the additional evidence did not warrant a different conclusion on any of the questions. The plaintiffs have fully accepted the commissioner’s stand, and the defendant has excepted only to the characterization of the gains realized when plaintiffs sold their partnership interests. We confine our discussion to that point. Further, we elaborate on Morse only to the extent necessary to take account of the Ninth Circuit’s recent decision relating to another of the Sam Berger Investment Company partners, Estate of Freeland v. Commissioner, 393 F. 2d 573 (C.A. 9, March 1968, rehearing denied May 6, 1968), affirmmg 25 T.C.M., 1473, ¶ 66,283 P-H Memo T.C. (1966), and to deal with the one argument which the Government presses here but did not raise before the court in Morse.
To recapitulate the pertinent facts — In 1954 a limited partnership, the Sam Berger Investment Company (SBIC), was formed with the interests and management authority divided as follows: Sam Berger (twenty percent) and E. L. Freeland (thirty-two percent) were general partners; the HAB Trust (ten percent), the MLB Trust (ten percent), *448 Margaret Lowthian (eight percent), and the Lake Murray Trust No. 1 (twenty percent) were limited partners. Through the settlement of a lawsuit concerning the Lake Murray Trust No. 1 and the Lake Murray Development Company, both of the present plaintiffs the husbands) acquired, in 1956, a .723 percent interest in SBIC (as did Morse).
The principal asset of the partnership was a plot of 4500 acres of land in San Diego County on which the partnership, with numerous disputes and little success, allegedly sought from 1954 to mid-1956 to develop housing subdivisions. The partnership also, after acquiring the land, supervised the planting and harvesting of barley on a portion of it.
The partnership agreement prohibited both limited and general partners from selling, assigning, or transferring their partnership interest to any person other than another partner, and further provided that “it is specifically understood and agreed that neither partner, general or limited, may sell, assign, transfer, convey, hypothecate nor encumber his interest nor any part thereof in this partnership without the written consent of both general partners.” However, Sam Berger contracted on August 10,1956, to sell his twenty percent share, along with the ten percent shares he had acquired from the HAB and MLB trusts of which he was trustee, to a group of individuals known as the Tavares group; and on November 26, 1956, E. L. Freeland and Margaret Lowthian similarly agreed to sell their interests to Tavares. None of the selling partners obtained the consent of the other partners before contracting with Tavares. On October 31, 1957, the Tavares group purchased the interests of the remaining partners (including the present plaintiffs and Morse), and at the same time received their consent to the prior contracts.
From August 10, 1956 (when Berger agreed to sell to the Tavares group) to October 1957, no development work was performed by SBIC on or in connection with the land, none of its land was sold, and no obligation or indebtedness was incurred by the partnership. SBIC, through hired hands, did continue the barley-farming operations.
In Morse the Government’s argument was that the gain the taxpayer realized from the sale of his partnership interest *449 was “attributable to * * * inventory items of the partnership which have appreciated substantially in value” and therefore had to “be considered as an amount realized from the sale or exchange of property other than a capital asset.” Int. Eev. Code of 1954, § 751(a). On examining this issue— a question of fact — -we concluded that, when Morse sold his interest[4] in October 1957, the realty was not then being held by the partnership as inventory (i.e., it was not held “primarily for sale to customers in the ordinary course of [its] trade or business,” Int. Eev. Code of 1954, § 1221(1)), and, therefore, that Morse realized a capital gain by virtue of Int. Code of 1954, § 741.[5]
We found it unnecessary to decide the land’s character prior to August 10, 1956 (the date of the Berger sale), and indicated that “it might be proper” to treat it as inventory at that time because of the “interlocking relationship” among SBIC, the Country Club Park joint venture, and the Lake Murray Development Company (both of the latter were “actively engaged” in developing the partnership land). 178 Ct. Cl. at 417-19, 371 F. 2d at 481. It was our view that, no matter what the business of the partnership prior to the August date, the preponderance of the evidence indicated that all the problems and circumstances leading up to, and including, Berger’s contract of sale induced the partnership to give up its plans for developing the land and instead to continue to hold it but as investment property.
The Government, whose evidence and contentions with respect to Section 751 are virtually the same as in Morse, has not persuaded us that, on the facts, we were wrong there. But we are told that Morse is contrary to the Ninth Circuit’s *450 opinion in Freeland v. Commissioner, supra, 393 F. 2d 573 (1968), affirming 25 T.C.M. 1473, ¶ 66,283 P-H Memo T.C., and that we should not allow such a conflict to persist.
We find nothing in Freeland essentially at odds with our decisions in Morse and the present cases. The court of appeals’ affirmance of the Tax Court determination that the purpose for which SBIC held the land did not change prior to November 26, 1956 (when Freeland and his business secretary, Margaret Lowthian, contracted to sell their interests) was based on its inability to “conclude that it was ‘clearly erroneous’ for the Tax Court to find that the partnership’s purpose had not changed.” 393 F. 2d at 584. It said: “We cannot hold as a matter of law that that purpose must have changed.” Ibid, (original emphasis) ,[6] At the same time, the court pointed out that the Tax Court could probably have reached the opposite conclusion (393 F. 2d at 584) :
Petitioners’ contentions admittedly are not wholly without support. There would perhaps have been some basis for a finding that SBIC’s original purpose changed * * *. It is quite conceivable that, particularly after the failure of [the Lake Murray Development Company] and the entry into SBIC of Tavares (who wanted to develop the land directly), SBIC’s “purpose” regarding the land was to some degree not clearly defined.[7]
In short, assuming that the records in Morse and Freeland are identical, the difference in results is simply a reasonable disagreement between two triers of the facts in appraising the evidence. Though unfortunate perhaps, the different tax consequences for Morse and the present plaintiffs, on the one hand, and Freeland and Lowthian, on the other, are the result of the various taxpayers having had their rights adjudicated in two different forums, each of which has primary fact-finding responsibilities. This is not a sufficient reason for us to abandon what we consider the correct— *451 though not necessarily the only reasonable — conclusion. In fulfilling our judicial obligation, we have merely evaluated the facts differently than the Tax Court did in pursuit of its responsibility.[8]
We are not at all sure that we even have a real difference with the Tax Court on the change-of-purpose point. First, we do not know whether the pertinent evidence before us in Morse (and here) was all before the Tax Court in Freeland. Second, if the change-of-purpose theory was presented to that court, it seems — as the court of appeals noted (393 F. 2d at 583) — to have been an afterthought, not articulated as it was when Morse reached this court. The Tax Court’s introductory statement that “we are not faced with a situation involving a change of purpose” (25 T.C.M. at 1480, ¶ 66,283 P-H Memo T.C. at 1651) indicates that those taxpayers did not make an effort to compile a record in support of the point. They seem rather to have hinged their argument on the fact, viewed in isolation, that they “realized a substantial profit on their bulk sale to Tavares.” 25 T.C.M. at 1482, ¶ 66,283 P-H Memo T.C. at 1654.
Our Morse opinion does not contradict the Tax Court’s correct retort that “the fact that the tract was sold ‘in bulk’ [does not] operate to change the purpose of the partnership in holding the land.” 25 T.C.M. at 1482, ¶ 66,283 P-H Memo T.C. at 1654. Nor do we disagree with the court of appeals’ response (to the more extensive change-of-purpose argument presented there) that a court should be “wary” of finding that “because of a lack of business success, the purpose for which property is held by a partnership changes from one of sale to customers to one of investment”, and that the Congressional purpose to prevent parties from converting ordi *452 nary income into capital gain “would in many instances be frustrated if partners’ decisions to sell their interests necessarily sufficed to establish the sort of ‘change of purpose’ which petitioners contend occurred here” (emphasis added). 393 F. 2d 584.
Morse is based on the conclusion that “all the circumstances” there (not just an intent to “liquidate” or a “bulk sale” alone) show that some time after August 10, 1956, the partnership “completely lost its original purpose” and that “the land was being held for its appreciation in value, and not for sale in the ordinary course of trade or business.” 178 Ct. Cl. at 418, 371 F. 2d at 481-82. That was a factual conclusion, not the promulgation of a rule of law, and one of the factors on which the determination rested was that Morse (and the present plaintiffs) held on to the property until October 31, 1957, hoping to get as much for their interests as they could. Freeland and Lowthian, on the other hand, sold out a year earlier, in November 1956, a much shorter time after Berger’s sale in August 1956. Possibly that distinction in facts could be crucial.
- In its argument in the present cases the Government has added a new argument based on Int. Rev. Code of 1954, § 708 [9] — a point not used in Morse, or, apparently, made to either the Tax Court or the court of appeals in Freeland. The Government’s new theory is this: (i) Sam Berger Investment Company was terminated, as a matter of law, by Section 708(b)(1) for tax purposes sometime in August or November of 1956, and at that time the partnership property was held as inventory; (ii) upon this constructive termination, each partner received a constructive share of the partnership property, and the plaintiffs sold that property, *453 not partnership interests, in October 1957; (iii) by Section 735(a) (2) of the 1954 Code,[10] distributed inventory property retains its character if the distributee partner sells it within five years from the date of distribution, regardless of his reason for holding it in the interim; and (iv) therefore, the gains realized by plaintiffs when they sold the constructively distributed inventory property in October 1957 were ordinary income.
The obvious goal of this hypothesis is to surmount Morse by rolling back the date for determining the character of the property to one on which it is more likely that we would hold the realty to have been inventory. We find it unnecessary to test the successive steps since we believe that the initial one — that there was a Section 708 termination before the property was sold by present taxpayers in October 1957— is unsound.
Subparagraph (a) of Section 708(b)(1) provides that a partnership is terminated if “no fart of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership” (emphasis added). There is nothing to indicate that this provision requires less than what it says — a complete cessation of all partnership business — and therefore we cannot accept the Government’s contention that a partnership is terminated if it abandons just its “primary purpose.” See David A. Foxman, 41 T.C. 535, 557 (1964), aff'd, 352 F. 2d 466 (C.A. 3, 1965) (no termination even though “these items were of comparatively minor character in contrast to the enterprise previously carried on”); James v. United States, 63-1 U.S.T.C. ¶ 9478, at 88307, 88309 (M.D. Ga. 1963); cf. Treas. Reg. § 1.708-1 (b) (1).
Though development activities on the land held by the partnership ceased about the time Sam Berger agreed to sell his interest to the Tavares group (August 10, 1956), the *454 partnership continued to engage in barley-growing ’operations on it. See finding 19.[11] This blocks the defendant’s attempt to have us judge the plaintiffs’ gain on the basis of the character which the partnership property had on August 10, 1956, or in November 1956. Furthermore, the fact that the partnership continued to hold the property for a business purpose — investment—might well be an adequate showing that it was not sufficiently inoperative to evoke the termination provision of Section 708 (b) (1) (A) ,[12]
The other subparagraph of 708(b)(1) terminates a partnership if “within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.” This provision was not, of course, triggered by the Berger contract, and the defendant does not contend that it was, since Berger agreed to sell only a forty percent interest (his own twenty percent interest plus the two ten percent interests acquired from the HAB and MLB trusts). The defendant does argue that a termination occurred when, three months after the Berger sale, Free- *455 land and Lowthian signed contracts, in November 1956, on tbeir combined interests of forty percent. The plaintiffs have replied, among other arguments, that the 50-percent provision cannot be used to show that the partnership terminated at that time because the other limited partners’ consent to the prior sales, required by the partnership agreement,[13] was not obtained until the remaining partners disposed of their interests in October 1957.
We accept this position. The Freeland and Lowthian sales were not validated until October 1957, and therefore were not effective within the 12-month period stipulated by Section 708(b) (1) (B). Since there is no hint of collusion or evasion in the failure to obtain all the partners’ consent in a year’s time, there is no ground for considering these inchoate sales as final and valid for tax purposes despite the absence of the essential consent. The result is that Section 708 is inapplicable because neither of its conditions for termination of a partnership has been met in these cases.[14]
We conclude that plaintiffs, like Morse, are entitled to capital-gain treatment of the proceeds of the sales in October 1957, and therefore can recover on that claim. For the reasons stated in Morse, plaintiffs are denied recovery on the other two claims stated in their petitions and the Government’s affirmative defense is not sustained.
FINDINGS OE PACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) The plaintiffs Max E. Ginsburg and Euth Ginsburg are husband and wife. They reside in Los Angeles, California;. (The evidence indicates that the plaintiff Euth Gins *456 burg was not involved in the events which gave rise to the present litigation, except that she signed a joint Federal income tax return with her husband for the year 'involved in the suit. Accordingly, when the term “the plaintiff Ginsburg” is used hereafter in the findings of fact, it will refer to the plaintiff Max E. Ginsburg.)
(b) The plaintiffs Allen E. Balton and Dorothy Balton are husband and wife. They reside in Los Angeles, California. (The evidence indicates that the plaintiff Dorothy Balton was not involved in the events which gave rise to the present litigation, except that she signed a joint Federal income tax return with her husband for the year involved in the suit. Accordingly, when the term “the plaintiff Balton” is used hereafter in the findings of fact, it will refer to the plaintiff Allen E. Balton).
(c) For many years, including the tax year involved in the present litigation, the plaintiff Ginsburg has been engaged in business as an executive in the manufacturing industry. Also, as indicated in subsequent findings, the plaintiff Ginsburg has been a participant in real estate ventures.
(d) For more than 15 years, including the tax year involved in the present litigation, the plaintiff Balton and Theodore Morse have been partners in the business of manufacturing women’s lingerie. Also, as indicated in subsequent findings, the plaintiff Balton has been a participant in real estate ventures.
2. During the period 1953-1954, six corporations designated as Hilltop Homes, Inc., Hilltop Ranchos, Inc., Hilltop Estates, Inc., Hilltop Park, Inc., Hilltop Vista, Inc., and Country Club Park Construction Co., Inc., were formed in the State of California for the purpose of acquiring real estate, developing real estate, and selling and dealing in real estate.
3. Prior to the formation of the corporations mentioned in finding 2, the individual investors who were planning to organize such corporations executed a joint venture agreement under the date of August 28, 1953, in the names of the six prospective corporations. The purpose of the joint venture was to develop 600 homes on approximately 160 acres *457 of land in Chula Vista, California. The joint venture was referred to in the agreement of August 28, 1953, as the “Country Club Park joint venture,” and it will be similarly referred to in subsequent findings.
4. Sam Berger was the person instrumental in the formation of the several corporations mentioned in finding 2 and in the creation of the Country Club Park joint venture, and he held a 30 percent interest in them. Other persons were involved as shareholders in the various corporations, and among them were Herbert Glaser (10 percent), Jack Baren-feld (6% percent), Samuel Glaser (6% percent), Theodore Morse (3% percent), the plaintiff Balton (3y3 percent), and the plaintiff Ginsburg (3% percent). E. L. Freeland, who was not an investor in the corporations previously mentioned or in the Country Club Park joint venture, was engaged by the joint venture as its land engineer.
5. (a) From time to time between December 1953 and March 1954, the plaintiff Ginsburg and the plaintiff Balton each invested in the corporations making up the Country Club Park joint venture. The total investment of each amounted to $11,250, and the proportion of the capital stock held 'by each was 3% percent.
(b) Neither the plaintiff Ginsburg nor the plaintiff Balton personally participated in the management or other activities of the corporations or of the joint venture.
6. In addition to the initial capitalization of each corporation, further advances were made by the stockholders to all six corporations from time to time for the benefit of the Country Club Park joint venture. All money advanced to any one corporation was made available for the general use of the joint venture. These advances were usually made by the stockholders in proportion to their stock ownership.
7. The funds of the several corporations previously mentioned were freely transferred among the group of corporations without any formal evidence of indebtedness.
8. The six corporations previously mentioned had common officers, directors, stockholders, employees, administrative facilities, and offices.
*458 9. The Country Club Park joint venture proceeded to develop the 160 acres of land mentioned in finding 3, by subdividing the land and constructing on it homes for sale.
10. On or about August 6, 1954, while the subdivision of the 160-acre tract of land in Chula Vista and the construction of homes thereon by the Country Club Park joint venture were in progress, a partnership was formed between Sam Berger and E. L. Freeland for the purpose of purchasing approximately 4,500 acres of land in San Diego, California. The land was commonly known as the Third Annexation of the Waring Property.
11. (a) On August 6, 1954, Sam Berger purchased, through escrow, on behalf of himself or his nominee, a parcel of land containing approximately 4,500 acres located in the County of San Diego, California, and designated as portions of Lots 67, 68, 69, and 70 of Rancho Mission. The total consideration provided for in the purchase agreement was $4,676,666.66. The land was acquired from the Kensington Heights Company, and was the same acreage referred to in finding 10. Of the total purchase price, a deposit of $100,000 was to be made within 30 days of the execution of the escrow agreement, and the agreement contained a promise on the part of the purchaser to pay the balance in 20 annual installments, the first to be due on August 6, 1955. These installment payments began at $180,000 per annum and were increased by $6,000 per annum until the 19th payment totaled $288,000. The 20th payment was to be $130,666.66.
(b) The escrow agreement further provided in part as follows:
Buyer shall deposit or cause to be deposited with Union Title Insurance and Trust Company * * * the sum of not less than $200,000 in cash, which sum is not a part of the purchase price of said property, for the purpose of paying for the installation of on-site improvements, water facilities, water mains, sewers and roads to and on said property. Said sum shall be disbursed by Union Title Insurance and Trust Company upon instructions of Kensington Heights Company * * * for the payment of said costs. * * *
(c) The term “oif-site improvements” is used by builders to indicate that certain improvements, e.g., water, sewerage *459 facilities, roads, etc., are to be brought up to the property that is being developed.
12. (a) Pursuant to his agreement with E. L. Freeland, Sam Berger nominated the partnership to take title to the property covered by the escrow agreement mentioned in finding 11.
(b)The funds for the initial payment of $100,000 that was to be made within 30 days from August 6, 1954, were provided by E. L. Freeland to the extent of $70,,000 and by Sam Berger to the extent of $30,000.
13. (a) Several weeks subsequent to August 6, 1954, a formal limited partnership agreement was executed, and on November 22, 1954, a certificate of limited partnership was filed with the State of California. It was the intention of the partners that the effective date of the limited partnership would be August 6,1954.
(b) The limited partnership agreement indicated that Sam Berger and E. L. Freeland were the general partners, and that Miss Margaret Lowthian, the Lake Murray Trust No. 1, the HAB Trust, and the MLB Trust were the limited partners. The document further, stated that the purpose of the partnership was to carry on the business of buying, selling, and developing land upon the tract of approximately 4,500 acres referred to in findings 101 and 11. The partnership was to be known as the Sam Berger Investment Company.
(c) The certificate of limited partnership, signed by all of the partners and filed with the State of California in San Diego County, recited that the general nature of the business of the partnership was that of “buying, owning, holding, improving, selling, exchanging, leasing, mortgaging, and dealing in real and personal property.”
(d) Both the agreement and the certificate stated that the partnership would exist for a term of 10 years.
(e) The partnership agreement provided (among other things) that each partner, general or limited, was prohibited from selling, assigning, or transferring his interest in the partnership to any person other than another partner. The agreement further provided that “it is specifically understood and agreed that neither partner, general or limited, may sell, assign, transfer, convey, hypothecate, nor encumber his inter *460 est nor any part thereof in this limited partnership without the written consent of both general partners.”
(f) The respective interests of the general and limited partners in the Sam Berger Investment Company were as follows: general partner Sam Berger, 20 percent; general partner E. L. Freeland, 32 percent; limited partner HAB Trust, 10 percent; limited partner MLB Trust, 10 percent; limited partner Margaret Lowthian, 8 percent; and limited partner Lake Murray Trust No. 1, 20 percent.
(g) The interests of the HAB Trust and the MLB Trust in the Sam Berger Investment Company were created by Sam Berger for the benefit of two of his sons, Harvey A. Berger and Marshall L. Berger. Sam Berger was trustee of the HAB Trust and the MLB Trust.
(h) The 20 percent interest in the Sam Berger Investment Company -held under the name of Lake Murray Trust No. 1 was established for the benefit of Jack Barenfeld and Samuel Glaser, and represented a hidden, secret profit for them. The sum of $200,000 was required for off-site improvements in connection with the land purchased by the partnership (see finding 11(b)), and Jack Barenfeld and Samuel Glaser committed themselves to provide the $200,000 (over and above an initial sum of $400 in cash) in return for a 20 percent interest in the Sam Berger Investment Company.
14. The land' acquired by the Sam Berger Investment Company, as indicated in findings 11-13, was situated a distance of from 20 to 25 miles away from the project of the Country Club Park joint venture (see findings 3 and 9). It had been annexed to the City of San Diego on December 1, 1953. In connection with the petition for such annexation, a master-plan map was required and was prepared.
15. At the time when the Sam Berger Investment Company purchased the property referred to in findings 11-13, the land was in an undeveloped state, except that approximately 600 acres had been devoted to the growing of barley for several years under a lease issued by the former owner. However, the land was considered developable for urban usage at the time of its acquisition by the Sam Berger Investment Company; and the consideration paid by the Sam *461 Berger Investment Company for the land was a fair price if the intended use of the land was for urban development. During the period 1950-1954, other persons were developing for urban usage adjacent areas both to the east and to the west of the land acquired by the Sam Berger Investment Company. This near-by development enhanced the value of the property purchased by the Sam Berger Investment Company.
16. Of the 4,500 acres of land acquired by the Sam Berger Investment Company, there was a northern section of approximately 1,500 acres which was very hilly. The land in that section had a fair market value of from $200 to $300 an acre in 1954, on an average. The remaining 3,000 acres were divided into two fairly equal areas by a deep gully which formed the apex of a lake, known as Lake Murray. On the eastern side of the lake, the land was fairly flat. The land in this area had a fair market value of approximately $1,250 per acre, on the average, in 1954. On the western side of the lake, there was an area of rolling land close to the lake, totaling about 500 acres, which had a fair market value of approximately $2,000 per acre in 1954, on the average. The remainder of the land on the western side of the lake was hilly. It had a fair market value of approximately $1,250 per acre in 1954, on the average.
17. (a) On October 21, 1954, the Lake Murray Development Company was formed as a California corporation for the purpose of subdividing land and constructing homes thereon for sale or rental.
(b) The person instrumental in forming the Lake Murray Development Company was Sam Berger.
(c) In connection with the formation of the Lake Murray Development Company, it was intended that this company should engage in a program of purchasing land from the Sam Berger Investment Company for the purpose of constructing homes thereon.
(d) The capitalization of the Lake Murray Development Company was in the amount of $5,000, and this sum was provided by the corporations comprising the Country Club Park joint venture. The shares of stock in the Lake Murray De *462 velopment Company were initially issued to Herbert Glaser as trustee for tbe corporations comprising the Country Club Park joint venture. Thereafter, the capital stock was transferred on September 24, 1955, to the Country Club Park Construction Co., Inc., one of the corporations previously mentioned. Hence, the individuals owning the stock of the corporations making up the Country Club Park joint venture also owned, in effect, proportionate interests in the Lake Murray Development Company.
(e) Neither the plaintiff GinSburg nor the plaintiff Bal-ton personally participated in the management or other activities of the Lake Murray Development Company.
18. (a) Sometime before September 14, 1954, E. L. Free-land met with Wilson Woodcock, manager of the Eeal Estate Department of General Petroleum Corporation, a subsidiary of Mobil Oil Company. At that time, Mr. Freeland expressed the interest of the Sam Berger Investment Company in developing the entire 4,500-acre tract owned by the partnership in San Diego, California. Mr. Freeland discussed the possibility with Mr. Woodcock that Mr. Woodcock’s company would finance part of the development, supplying $200,000 for off-site improvements. On September 14,1954, a letter was sent to General Petroleum Corporation by Mr. Freeland, restating and reaffirming his discussion with Mr. Woodcock. General Petroleum Corporation subsequently rejected Mr. Freeland’s proposal.
(b) In order to obtain the funds with which to meet the first five annual escrow payments under the agreement of August 6, 1954 (see finding 11(a)), the Sam Berger Investment Company on October 26,1954, executed an option agreement with the Lake Murray Development Company, under which the latter corporation was granted an irrevocable option to purchase, within a 5-year period, a maximum of 500 acres of land within an area described in the document, such area being part of the 4,500 acres of land previously acquired by the Sam Berger Investment Company. The price to be paid by the Lake Murray Development Company for the land purchased under the option was $2,000 per acre.
(c) The option agreement of October 26, 1954, also stated that the Lake Murray Development Company had loaned to *463 the optionor the sum of $200,000 .to be deposited with the Union Title Insurance and Trust Company for the financing of off-site improvements, pursuant to the escrow agreement of August 6,1954.
(d) The area covered by the option referred to in this finding was situated on the eastern side of Lake Murray.
19. After acquiring the 4,500 acres of land mentioned in previous findings, the Sam Berger Investment Company carried on the raising of barley on approximately 600 acres of the land. The necessary labor for the planting and harvesting of the barley in the spring and fall of the year was hired by the Sam Berger Investment Company, as needed. The area in which the barley was raised included part of the 500 acres that were subject to the option agreement between the Sam Berger Investment Company and the Lake Murray Development Company. However, there was an agreement between the two companies that the farming operations would cease as to any portion of the 500 acres on which the Lake Murray Development Company might exercise the option.
20. (a) As indicated in findings 11 (b) and' 13(h), the Sam Berger Investment Company was required under the escrow agreement of August 6,1954, to deposit with the Union Title Insurance and Trust Company $200,000 for off-site improvements on the land acquired by the former company, and Jack Barenfeld and Samuel Glaser had made a commitment to provide this sum in exchange for a 20 percent interest, in the Sam Berger Investment Company, to be held under the name of Lake Murray Trust No. 1. Samuel Glaser and Jack Baren-feld fulfilled their commitment by causing $200,000 to be provided by the corporations comprising the Country Club Park joint venture. The Lake Murray Development Company was used as a conduit for the transfer of the money from the Country Club Park joint venture to the Union Title Insurance and Trust Company for the account of the Sam Berger Investment Company, under the escrow agreement; and the Union Title Insurance and Trust Company disbursed the funds for the off-si'te improvements required by the terms of the escrow agreement. The Sam Berger Investment Company did not expect to repay the $200,000, and the transaction *464 was not evidenced by any promissory note or other security instrument executed by the Sam Berger Investment Company.
(b)By virtue of the developments mentioned in paragraph (a) of this finding, the escrow closed on October 26, 1954.
21. The off-site improvements financed by the $200,000 referred to in finding 20 were made by the Sam Berger Investment Company on acreage that was covered by the option agreement with the Lake Murray Development Company, although not on the 150-acre parcel purchased by the Lake Murray Development Company pursuant to the partial exercise of its option (see finding 24).
22. In addition to granting the 500-acre option to the Lake Murray Development Company, and carrying on the farming operations mentioned in finding 19, the Sam Berger Investment Company engaged in the following activities:
(a) sold % acre f° the Pacific Telephone & Telegraph Company;
(b) granted options to the San Diego School District for the purchase of sites for three elementary schools and one junior high school;
(c) sold a small parcel of land near the westerly boundary to a developer of nearby land, in order that such developer might construct a reservoir that would furnish a gravity flow of water to his property (this sale having been a requirement imposed on the Sam Berger Investment Company by the Kensington Heights Company in the purchase and sale agreement between the two parties) ;
(d) granted easements for the laying of a gas line and a water line;
(e) had certain portions of the acreage rezoned as R-2 (residential) and commercial; and
(f) executed an agreement with the engineering firm of Freeland, Peterson and Evenson to design a master plan for the development of the land owned by the company.
23. (a) On November 8,1954, E. L. Freeland, as a member of the firm of Freeland, Peterson and Evenson, forwarded to the San Diego Planning Commission, on behalf of the Lake Murray Development Company, copies of a master-plan map *465 for the development of the land owned by the Sam Berger Investment Company, and copies of a master plan giving the details for the proposed development of approximately 1,100 acres for residential and commercial use. The Commission was requested to consider the planned development.
(b) The data referred to in paragraph (a) of this finding were considered by the San Diego Planning Commission. On December 1,1954, the Commission approved the development of an area which consisted of approximately 280 lots and which was to be the first unit in a proposed 4,500-acre development that would ultimately provide approximately 18,000 lots. Subsequently, on February 9, 1955, the Commission approved the development of an additional area that consisted of approximately 2,000 lots.
(c) The Lake Murray Development Company, as part of an extensive advertising campaign, had a full-page advertisement in the December 31, 1954 issue of the San Diego Evening Tribune, proclaiming the “Birth of a City,” a “City of Tomorrow,” that was to be located on “the famous Waring Estate property.” In this advertisement, Sam Berger was described as a “nationally famous Community Builder,” with “lifetime experience and directional ability.”
(d) On March 8, 1955, the Sam Berger Investment Company, after previous negotiations with the San Diego Unified School District, offered to sell school sites in the Lake Park area to the District at a price of $2,000 per acre for usable land, plus the average off-site cost of approximately $200 per acre, and plus on-site improvements, which were estimated to be less than $20 per front foot.
(e) On September 23, 1955, the Sam Berger Investment Company submitted a new offer to the San Diego Unified School District with respect to school sites in the. Lake Park area. Under this proposal, the basic price for each site was to be $1,900 per acre for usable land (instead of $2,000 per acre), and in so far as the sites might contain any land that was not usable for subdivision purposes, such land was to be included at the release price of $1,240 per acre up to August 6, 1956, with the understanding that the release price would increase at the rate of $40 per year on August 6 of each year *466 thereafter. The District was not to be called upon to pay any of the off-site costs. The District was either to improve or pay for its share of the improvements on the abutting streets.
24. Within a short time after the execution of the option agreement referred to in finding 18, the Lake Murray Development Company partially exercised its option by purchasing 150 acres of land from the Sam Berger Investment Company. The latter company did not retain any title to or interest in this acreage.
25. After acquiring the 150 acres of land referred to in finding 24, the Lake Murray Development Company proceeded to develop the land by constructing homes thereon and then selling the homes.
26. Sam Berger was President of the Lake Murray Development Company, and he was in active charge of that company’s development work on the 150 acres of land acquired by the Lake Murray Development Company from the Sam Berger Investment Company.
27. (a) Disagreements arose between Sam Berger and E. L. Freeland fairly early in their association as general partners in the Sam Berger Investment Company. These disagreements related principally to the fact that Sam Berger, as the President and general manager of the Lake Murray Development Company, engaged bulldozers and their operators to work on land which was included in the 500-acre option to the Lake Murray Development Company but as to which the Lake Murray Development Company had not yet exercised its option. Mr. Freeland was concerned over the possibility that charges for such development work might not be paid by the Lake Murray Development Company, with the result that there would be mechanics’ liens on the land, for which the Sam Berger Investment Company would be responsible.
(b) E. L. Freeland, through his attorney, on May 10, 1955, expressed his desire to supervise and concur in any contract that might be made for development work on land owned by the Sam Berger Investment Company, whether such work was for off-site improvements or for lot development.
*467 28. A loan of $100,000 was obtained by tbe Lake Murray Development Company on July 25, 1955 from the Bank of America. The loan was guaranteed by the plaintiff Ginsburg, the plaintiff Balton, and the other investors in the corporations comprising the Country Club Park joint venture.
29. Many of the bills and current expenses incurred by the Lake Murray Development Company in developing the 150-acre tract mentioned in findings 24 and 25 were paid by one or more of the corporations making up the Country Club Park joint venture. Funds were freely transferred by such corporations to the Lake Murray Development Company without any evidence of formal indebtedness. Advances made to the Lake Murray Development Company by the corporations comprising the Country Club Park joint venture were all subordinated to the loan made by the Bank of America to the Lake Murray Development Company.
30. Completion of the Lake Murray Development Company’s program for the construction of homes on the 150-acre tract purchased by the corporation from the Sam Berger Investment Company was guaranteed by the Phoenix Insurance Company of Hartford, Connecticut. In turn, the plaintiff Ginsburg, the plaintiff Balton, and the other investors in the corporations comprising the Country Club Park joint venture guaranteed the Phoenix Insurance Company against loss.
31. On August 8, 1955, the engineering firm of Freeland, Peterson and Evenson wrote to the Sam Berger Investment Company, setting forth alternative plans for development of the 500 acres that were subject to the option agreement with the Lake Murray Development Company. This letter informed the Sam Berger Investment Company of the expenses which it would incur in off-site improvements if the proposed plans for development were adopted. Because of the prospective expense to the Sam Berger Investment Company, the proposed plans were abandoned.
32. The Lake Murray Development Company’s project for the development of the 150-acre parcel of land mentioned in previous findings was a failure. As a consequence, the Lake Murray Development Company became insolvent; and on May 4,1956, it assigned to the Phoenix Insurance Company all of its assets, except that the Lake Murray Development *468 Company retained the right under the option agreement of October 26, 1954, to purchase 200 acres of land out of the 500-acre area originally covered by the option. Therefore, since the Lake Murray Development Company had already partially exercised the option by purchasing the 150 acres of land mentioned in previous findings, the portion of the option assigned to the Phoenix Insurance Company covered the right to purchase 150 acres of land from the Sam Berger Investment Company under the option. This right was subsequently exercised by the Phoenix Insurance Company.
33. (a) Upon learning that Jack Barenfeld' and Samuel Glaser had provided $200,000 for the Sam Berger Investment Company out of funds belonging to the corporations which comprised the Country Club Park joint venture, in return for a 20 percent interest in the Sam Berger Investment Company under the name of Lake Murray Trust No. 1, the plaintiff Ginsburg, the plaintiff Balton, and the other stockholders in the corporations comprising the Country Club Park joint venture (excluding Sam Berger, Jack Barenfeld, and Samuel Glaser) contested the hidden interest of Jack Baren-feld and Samuel Glaser in the Sam Berger Investment Company under the name of Lake Murray Trust No. 1. The plaintiff Ginsburg, the plaintiff Balton, and their associates in the contest contended that, by virtue of the use of $200,000 belonging to the Country Club Park joint venture for the benefit of the Sam Berger Investment Company, they had a participating interest in the Sam Berger Investment Company through the Lake Murray Trust No. 1. This dispute was settled on May 7, 1956 by dividing the 20 percent limited partnership interest of the Lake Murray Trust No. 1 among all the individuals owning stock in the corporations making up the Country Club Park joint venture (excluding Sam Berger). The plaintiff Ginsburg, the plaintiff Balton, and their associates in the contest paid no additional monetary consideration for their interests in the Sam Berger Investment Company.
(b) As a result of the developments referred to in paragraph (a) of this finding, the plaintiff Ginsburg and the *469 plaintiff Balton each, had a .723 percent interest in the Sam Berger Investment Company.
34. (a) In August 1956, Carlos Tavares, representing a group of individuals which included himself and which will be referred to hereafter in the findings as the “Tavares group,” approached Sam Berger with respect to the acquisition of Mr. Berger’s interest in the Sam Berger Investment Company. On August 10,1956, Sam Berger and the Tavares group entered into a contract of sale and purchase. In this document, the seller, Sam Berger, warranted that he held his original 20 percent interest in the Sam Berger Investment Company and that he had acquired the interests of the HAB Trust and the MLB Trust, so that he then had a 40 percent interest in the Sam Berger Investment Company. The document further stated that this 40 percent interest was conveyed by Sam Berger to the Tavares group for $950,000.
(b) The document mentioned in paragraph (a) of this finding further stated as follows:
The sale which is the subject of this agreement does not contemplate that the Buyers will acquire any interest in existing partnership cash, whether in partnership bank accounts or on deposit in trust accounts of other persons. As a matter of fact, it is the intention of the parties hereto that the only asset of said partnership which the Buyers will acquire is the land described in EXHIBIT “A” [i.e., the 4,500 acres acquired by the Sam Berger Investment Company on August 6, 1956, less the acreage disposed of in the meantime, as indicated in previous findings].
(c)- Sam Berger did not obtain the approval of E. L. Free-land or of the limited partners in the Sam Berger Investment Company before entering into the contract of sale mentioned in this finding.
35. (a) On August 13, 1956, the corporations comprising the Country Club Park joint venture and the individual investors in those corporations filed against Sam Berger an action for money lent, money had and received, and money paid on open book account. The complaint sought a judgment for $52,438.97. Subsequently, the complaint was *470 amended to include additional allegations charging Mr. Berger with fraud, misrepresentation, and diversion of income.
(b) The litigation referred to in paragraph (a) of this finding arose out of Sam Berger’s activities in connection with the Country Club Park joint venture and the Lake Murray Development Company.
(c) On October 28, 1957, Sam Berger entered into an agreement of settlement, compromise, and release with the opposing parties in the case referred to in the preceding paragraphs of this finding, under which it was agreed that the charges against Mr. Berger would be dismissed upon the payment by Mr. Berger to the opposing parties of a total of $208,500.
(d) Under the settlement agreement, the releasors discharged Sam Berger from “all manner of actions and causes of action, accounts, contracts, claims, and demands of every kind and nature whatsoever * *
(e) The settlement agreement contemplated that the payment by Mr. Berger of the $208,500 would be made over a period of 6 years.
(f) The share of the plaintiff Ginsburg and the share of the plaintiff Balton in the $208,500 to be paid by Sam Berger over a 6-year period amounted to $13,500 each.
(g) During the calendar year 1958, the plaintiff Ginsburg and the plaintiff Balton each received $5,000 under the settlement agreement of October 28, 1957 with Sam Berger.
S6. (a) After entering into the contract with Sam Berger for the purchase of his 40 percent interest in the Sam Berger Investment Company, as indicated in finding 34, the Tavares group approached E. L. Freeland with respect to the acquisition of his 32 percent interest in the Sam Berger Investment Company. On November 26,1956, a contract of purchase and sale was entered into between the Tavares group and Mr. Freeland, under which Mr. Freeland’s interest in the Sam Berger Investment Company was conveyed to the Tavares group for a total consideration of $730,000. This contract stated that the buyers were not to receive any interest in the cash of the Sam Berger Investment Company.
*471 (b) E. L. Freeland did not obtain tlie approval of the limited partners in the Sam Berger Investment Company before entering into the contract that is mentioned in this finding.
37. At the time when the Tavares group entered into the contract with E. L. Freeland that is mentioned in finding 36, the Tavares group also acquired the 8 percent limited partnership interest of Margaret Lowthian in the Sam Berger Investment Company.
38. As of November 26, 1956, the Sam Berger Investment Company still owed $4,210,666.66 on the purchase price of the land acquired on August 6,1954.
39. A Federal income tax return was filed on behalf of the Sam Berger Investment Company for the period from January 1, 1956, to November 26, 1956, as a final return for the partnership.
40. (a) On October 31, 1957, after some negotiations, the Tavares group entered into a contract of purchase and sale with the limited partnership interests in the Sam Berger Investment Company (other than Margaret Lowthian, the HAB trust, and the MLB trust), and thereby received the limited partners’ consent to the prior arrangements made by the Tavares group for the purchase of other interests in the Sam Berger Investment Company, as indicated in findings 34,36, and 37.
(b) During the negotiations mentioned in paragraph (a) of this finding, the limited partnership group was represented by Jack Barenfeld and Samuel Glaser. They contended, through their attorney, that the Tavares group had no right to participate in the affairs of the partnership or to direct or control its affairs.
(c) During the negotiations mentioned in paragraph (a) of this finding, Jack Barenfeld and Samuel Glaser both expressed an intention of individually joining Mr. Tavares as partners in the development of the property involved in the negotiations. However, the limited partners, as a group, refused to join, and never did join, with Mr. Tavares. Instead, they held on to their interests in the Sam Berger Investment Company, with the expectation that the longer they *472 held on, the more money the Tavares group would pay them for their interests.
(d) Under the contract of October 31, 1957, the Tavares group agreed to pay the limited partners, including the plaintiff Ginsburg and the plaintiff Balton, a total of $600,000 in installments for their interests in the Sam Berger Investment Company, the only asset of which was stated to be 4,200 acres of land.
(e) By virtue of the contract dated October 31, 1957, the Tavares group completed the acquisition of a 100-percent interest in the land owned by the Sam Berger Investment Company.
(f) During the calendar year 1958, the plaintiff Ginsburg and the plaintiff Balton each received $7,605.42 under the contract mentioned in this finding.
41. (a) In each of the contracts mentioned in findings 34, 36, 37, and 40, the Tavares group agreed to assume the remaining liability under the escrow agreement of August 6, 1954, and the promissory note that covered the remainder due under the original purchase agreement.
(b) As of October 31, 1957, the Sam Berger Investment Company still owed $4,018,666.66 on the purchase price of the land acquired on August 6,1954.
42. (a) As indicated in finding 32, when the Lake Murray Development Company assigned its assets to the Phoenix Insurance Company, the former retained the right to exercise the option of October 26,1954 as to 200 acres. Subsequently, the Lake Murray Development Company assigned this retained interest in the option to the plaintiff Ginsburg, the plaintiff Balton, and the other investors in the corporations comprising the Country Club Park joint venture (i.e., the owners of the Lake Murray Development Company), who had advanced additional sums to the Lake Murray Development Company during the course of its financial difficulties. The assignment was executed in consideration of the cancellation of claims based upon such advances.
(b) On August 1, 1957, the assignees, as a group, gave written notice to the Sam Berger Investment Company of their intention of exercising the option, to the extent of 150 *473 acres of land, and deposited the necessary consideration therefor with the Union Title Insurance and Trust Company.
(c) On October 31, 1957, the assignees sold their interest in the land option to the Tavares group for $340,000, to be paid in installments. As a part of this transaction, the notice of the exercise of the option mentioned in paragraph (b) of this finding was rescinded, and the deposit which the assignees had made was returned to them.
(d) Tire sale of the option interest referred to in this finding was made at the same time that the plaintiff Ginsburg, the plaintiff Balton, and other limited partners in the Sam Berger Investment Company conveyed their combined 20 percent interest in that company to the Tavares group. Both sales were part of a “package deal.”
(e) In 1958, the plaintiff Ginsburg and the plaintiff Balton each received a sum of money (the exact amount of which is not clearly revealed by the record) under the contract of sale for the disposition of the option interest to the Tavares group.
(f) In 1958, the plaintiff Ginsburg and the plaintiff Balton each incurred expense (the exact amount of which is not clearly revealed by the record) in connection with the sale of the land option.
43. During the period1 between the signing of the contract between Sam Berger and the Tavares group on August 10, 1956, and the signing of the contract between the limited partners and the Tavares group on October 31, 1957, no development work was performed on the land owned by the Sam Berger Investment Company, none of the land was sold or offered for sale, and no obligation or indebtedness was incurred for the account of the Sam Berger Investment Company. Some planning work was performed during the period by the Tavares group with respect to the prospective development of the land, but any expense involved in such work was defrayed by the Tavares group.
44. (a) Under the guaranty which the plaintiff Ginsburg and the other investors in the Lake Murray Development Company had made to the Phoenix Insurance Company (see finding 30), the plaintiff Ginsburg was required in 1958 to *474 pay to the Phoenix Insurance Company a total of $6,670 as his part of the guaranty, and he also paid legal fees amounting to $1,220.79.
(b) Under the guaranty which the plaintiff Balton and the other investors in the Lake Murray Development Company had made to the Phoenix Insurance Company (see finding 30), the plaintiff Balton was required in 1958 to pay to the Phoenix Insurance Company a total of $6,670 as his part of the guaranty, and he also paid legal fees amounting to $1,220.79.
45. (a) In addition to the transactions referred to in previous findings, the plaintiff Ginsburg: (1) sold in September 1958 a piece of land that had been purchased in April 1957; and (2) owned interests in, and received income from, several other pieces of real estate.
(b) In addition to the transactions referred to in previous findings, the plaintiff Balton: (1) sold on March 16, 1955 a hotel property which he had acquired on August 31, 1954; and (2) owned interests in, and received income from, several other pieces of real estate.
48. (a) On or before April 15, 1959, the plaintiffs Max It. Ginsburg and Ruth Ginsburg filed a joint Federal income tax return for the calendar year 1958, showing a tax for that year in the amount of $11,862.
(b) On or before April 15, 1959, the plaintiffs Allen R. Balton and Dorothy Balton filed a joint Federal income tax return for the calendar year 1958, showing a tax for that year in the amount of $14,499.37.
47. (a) On or before April 15, 1959, the plaintiffs Max R. Ginsburg and Ruth Ginsburg paid to the District Director of Internal Revenue in Los Angeles, California, $11,862 for their income tax liability with respect to the year 1958.
(b) On or before April 15, 1959, the plaintiffs Allen R. Balton and Dorothy Balton paid to the District Director of Internal Revenue in Los Angeles, California, $14,499.37 for their income tax liability with respect to the year 1958.
48. (a) The plaintiffs Max R. Ginsburg and Ruth Ginsburg timely extended the time for the assessment of additional income tax respecting the year 1958 to June 30,1962.
*475 (b)The plaintiffs Allen R. Balton and Dorothy Balton timely extended the time for the assessment of additional income tax respecting the year 1958 to June 30,1962.
49. (a) In their joint income tax return for 1958, the plaintiffs Max R. Ginsburg and Ruth Ginsburg treated the sum of $7,605.42 mentioned in finding 40(f) as a capital gain. In auditing these plaintiffs’ income tax return for 1958, the Internal Revenue Service determined that such sum constituted ordinary income.
(b) In their joint income tax return for 1958, the plaintiffs Allen R. Balton and Dorothy Balton treated the sum of $7,605.42 mentioned in finding 40(f) as a capital gain. In auditing these plaintiffs’ income tax return for 1958, the Internal Revenue Service determined that such sum constituted ordinary income.
(c) The plaintiffs Max R. Ginsburg and Ruth Ginsburg, in their income tax return for 1958, did not include the item of $5,000 mentioned in finding 35(g) as taxable income. In auditing these plaintiffs’ income tax return for 1958, the Internal Revenue Service determined that $3,644 out of the $5,000 constituted ordinary income.
(d) The plaintiffs Allen R. Balton and Dorothy Balton, in their income tax return for 1958, did not include the item of $5,000 mentioned in finding 35 (g) as taxable income. In auditing these plaintiffs’ income tax return for 1958, the Internal Revenue Service determined that $3,644 out of the $5,000 constituted ordinary income.
(e) In their income tax return for 1958, the plaintiffs Max R. Ginsburg and Ruth Ginsburg treated the amounts of $6,670 and $1,220.79 referred to in finding 44(a), and the expense referred to in finding 42(f), as wholly deductible in 1958. In auditing these plaintiffs’ income tax return for 1958, the Internal Revenue Service treated such items as allocable to the cost basis of the land option mentioned in finding 42; and, accordingly, such items were utilized by the IRS to reduce proportionately these plaintiffs’ gain in 1958 from the sale of the land option, these plaintiffs having reported the gain on the installment basis.
*476 (f) In their income tax return for 1958, the plaintiffs Allen R. Balton and Dorothy Balton treated the amounts of $6,670 and $1,220.79 referred to in finding 44(b), and the expense referred to in finding 42(f), as wholly deductible in 1958. In auditing these plaintiffs’ income tax return for 1958, the Internal Revenue Service treated such items as allocable to the cost basis of the land option mentioned in finding 42; and, accordingly, such items were utilized by the IRS to reduce proportionately these plaintiffs’ gain in 1958 from the sale of the land option, these plaintiffs having reported the gain on the installment basis.
(g) In their income tax return for 1958, the plaintiffs Max R. Ginsburg and Ruth Ginsburg treated the sum referred to in finding 42(e) as a capital gain, and it was similarly treated by the Internal Revenue Service in the audit of these plaintiffs’ 1958 income tax return. However, in the present litigation, the defendant has asserted as an affirmative defense that such sum actually constituted ordinary income.
(h) In their income tax return for 1958, the plaintiffs Allen R. Balton and Dorothy Balton treated the sum referred to in finding 42(e) as a capital gain, and it was similarly treated by the Internal Revenue Service in the audit of these plaintiffs’ 1958 income tax return. However, in the present litigation, the defendant has asserted as an affirmative defense that such sum actually constituted ordinary income.
50. (a) On or before June 30, 1962, the plaintiffs Max R. Ginsburg and Ruth Ginsburg were timely assessed additional income tax in the amount of $776.62, plus interest thereon in the amount of $148.70. These plaintiffs paid such sums on July 13, 1962.
(b) On or before June 30, 1962, the plaintiffs Allen R. Balton and Dorothy Balton were timely assessed additional income tax in the amount of $4,677.01, plus interest thereon in the amount of $895.55. These plaintiffs paid such sums on July 10,1982.
51. (a) On August 7,1963, the plaintiffs Max R. Ginsburg and Ruth Ginsburg filed a timely claim for refund of tax and interest paid by them in the amount of $6,405.32, plus *477 $148.70 interest. Tbe grounds alleged in the claim were as follows:
The revenue agent treated a sum of $7,605.42 received by claimants (from the sale of property consisting of their percentage interest in certain acreage, which acreage had at a prior time been held by a partnership known as Sam Berger Investment Company) as ordinary income by virtue of § 735 of IEC. This was error. The property sold by claimants was not property other than a capital asset, by virtue of § 735 or any other section of IEC.
The agent also added to income as ordinary income a net sum of $3,644.00 derived by claimants from a settlement with one Sam Berger. (The said net sum represents a sum received of $5,000.00 less a cost factor of $1,356.00.) The said net sum was capital gain, not ordinary income. Furthermore, the said net sum is fully offset by expenses and losses relating to the same transaction and in respect of which the said net sum was received. It should not be taxed at all.
The revenue agent also disallowed deduction of $6,-670.00 paid as indemnity to Phoenix Insurance Co. and legal fees and expenses of $1,433.86 related thereto. Claimants believe these are deductible under IEC § 165(c) (2).
(b) The claim of the plaintiffs Max E. Ginsburg and Euth Ginsburg for refund sought the sum of $6,554.02, “or such other amount as may be refundable based upon the claims made.”
■ (c) On April 11, 1963, the claim for refund of the plaintiffs Max E. Ginsburg and Euth Ginsburg was denied.
52. (a) On August 7, 1962, the plaintiffs Allen E. Balton and Dorothy Balton filed a timely claim for refund of the additional sums of tax and intei’est paid by them, as indicated in finding 50(b). The grounds alleged in the claim were identical with those set out in the claim of the plaintiffs Max E. Ginsburg and Euth Ginsburg, as indicated in finding 51(a).
(b) The claim of the plaintiffs Allen E. Balton and Dorothy Balton for refund sought the sum of $5,572.56, “or such other amount as may be refundable based upon the claims made.”
*478 (c) On. May 31, 1963, the claim of the plaintiffs Allen R. Balton and Dorothy Balton was denied.
53. (a) The respective sums of $7,605.42 which the plaintiff Ginsburg and the plaintiff Balton severally received in 1958 under the contract of October 31, 1957, involving the sale of their respective interests in the Sam Berger Investment Company, as indicated in finding 40, were attributable to land which the partnership owned.
(b) As of October 31, 1957, the land referred to in paragraph (a) of this finding was not held for sale to customers in the ordinary course of trade or business.
(c) As of October 31, 1957, the land referred to in paragraph (a) of this finding did not fall within the category of “inventory items,” as that term is used in Sections 741 and 751 of the Internal Revenue Code of 1954.
(d) The respective sums of $7,605.42 which the plaintiff Ginsburg and the plaintiff Balton severally received in 1958 pursuant to the sale of their respective partnership interests constituted capital gains, rather than ordinary income.
54. (a) The evidence does not establish that the respective sums of $5,000 which the plaintiff Ginsburg and the plaintiff Balton each received in 1958 pursuant to the agreement of October 28,1957 under which the lawsuit against Sam Berger was settled (as indicated in finding 35) consisted wholly of compensation for the loss or impairment of a capital asset.
(b) The evidence indicates that not less than $3,644 of the $5,000 received in 1958 by the plaintiff Ginsburg, and not less than $3,644 of the $5,000 received in 1958 by the plaintiff Balton, represented punitive damages on account of wrongful conduct by Sam Berger.
(c) Not less than $3,644 out of the $5,000 received in 1958 by the plaintiff Ginsburg, and not less than $3,644 out of the $5,000 received in 1958 by the plaintiff Balton, constituted ordinary income.
55. (a) The evidence establishes' that as of October 31, 1957 neither the plaintiff Ginsburg nor the plaintiff Balton was engaged in the business of selling land or interests in land to customers.
(b) The evidence establishes that if the plaintiff Ginsburg, the plaintiff Balton, and their associates had exer *479 cised on October 31, 1957 the 200-acre land option referred to in finding 42, the respective interests of the plaintiff Ginsburg and the plaintiff Balton in the land thus acquired would not have been held by the plaintiff Ginsburg and the plaintiff Balton primarily for sale to customers in the ordinary course of the respective plaintiffs’ trade or business.
(c) The sale on October 31,1957 by the plaintiff Ginsburg and the plaintiff Balton of their respective interests in the 200-acre land option constituted the sale of capital assets by the respective plaintiffs, rather than the sale of property held by the respective plaintiffs primarily for sale to customers in the ordinary course of the respective plaintiffs’ trade or business.
(d) The respective gains realized by the plaintiff Ginsburg and the plaintiff Balton in 1958 from the sale on October 31, 1957 of their respective interests in the 200-acre land option constituted capital gains under Section 1234(a) of the Internal Revenue Code of 1954, as amended.
56. (a) The evidence does not establish that the expenses referred to in findings 42(f) and 44 constituted ordinary expenses by the plaintiff Ginsburg and the plaintiff Balton in the course of doing business.
(b) The evidence warrants the inference that the expenses referred to in findings 42(f) and 44 constituted part of the cost basis for the land option which the plaintiff Ginsburg, the plaintiff Balton, and their associates received as part of the over-all settlement between the Lake Murray Development Company and the Phoenix Insurance Company.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes ás a matter of law that the plaintiffs Max R. Ginsburg and Ruth Ginsburg are entitled to recover in case No. 70-65 on their claim relating to the taxability of the proceeds from the sale of the partnership interest, and that the plaintiffs Allen R. Balton and Dorothy Balton are also entitled to recover in case No. 73-65 on their claim relating to the taxability of the proceeds from the sale of the partnership interest, and judgment is *480 entered to that effect. The amounts of the respective recoveries on such claims will be determined in subsequent proceedings pursuant to Rule 47 (c). The court further concludes as a matter of law that the plaintiffs are not entitled to recover on the other claims asserted in their respective petitions, and, accordingly, the respective petitions are dismissed as to such claims.

We are Indebted to Trial Commissioner Mastín G. White for his memorandum opinion submitted under the order of reference and Rule 57(a).

 Neither side suggests that the new evidence differentiates these cases from Morse.

 As indicated infra the Government contests the contention that plaintiffs sold partnership interests rather than shares of distributed partnership assets.

 This issue was raised by the defendant’s affirmative defense. Plaintiffs have been assessed at capital-gain rates and wish to retain that treatment.

 We treat this issue on the assumption that plaintiffs did sell a partnership interest, since we decide infra that the Government is incorrect in asserting that the partnership was terminated no later than November 1956 under Section 708(b) (1) and that the land was distributed at that time — points which it did not raise in Morse — and that the plaintiffs sold their portions of the distributed land (rather than their partnership interests) in October 1957. See the discussion of Section 708 infra.

 “§ 741. Recognition and character of gain or loss on sale or exchange
“In case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).”

 On the same ground, it upheld the Tax Court’s finding that the partnership’s acquisition of the land was motivated by a desire to develop it into subdivisions. As to this issue the court of appeals concluded that the “Tax Court might possibly have properly found in the petitioners’ favor.” 393 F. 2d at 583.

 This quotation incorporates changes made in the Ninth Circuit’s opinion by its Order on Petition for Rehearing, dated May 6, 1968.

 The defendant also argues tliat our decision results In an unfair discrimination against Sam Berger. Assuming (though it is not clear) that Berger’s gain on the sale of his partnership interest to the Tavares group would be ordinary income under Section 751 because it was attributable to substantially appreciated inventory property, we see no unfairness in holding that other partners are entitled to capital-gains treatment because they sold their interests after — in the ease of the taxpayers in this court, considerably after — the purpose for which the partnership held the property had changed. The reverse could also happen. Suppose Berger sold at a time when the partnership held land for investment, but shortly thereafter it decided to develop the land. In that ease, Berger would receive the tax “break”.

 “§ 708. Continuation of partnership
“ (a) General rule.- — Nor purposes of this subchapter, an existing partnership shall be considered as continuing if it is not terminated.
“(b) Termination.-—
(1) General rule. — Nor purposes of subsection (a), a partnership shall be considered as terminated only if — ■
(A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or
(B) -within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits."

 “§ 735. Character of gain or losa on disposition of distributed property
“(a) Sale or exchange of certain distributed property.—
# * * * #
(2) Inventory items. — Gain or loss on tie sale or exchange by a distributee partner of inventory items * * * distributed by a partnership shall, if sold or exchanged 'within 5 years from the date of the distribution, be considered gain or loss from the sale or exchange of property other than a capital asset.”

 The Government has belatedly argued that the evidence does not show that the partnership was really carrying on farming activities after August 1956 and that, if the court considers the matter important, the case should be remanded to the trial commissioner for further evidence. As we read the commissioner’s finding 19, SBIC farmed the land continually from the time it was acquired on through all relevant periods. There is testimony from 33. I/. Freeland that, at the time he sold his interest in November 1956, the partnership was carrying on the raising of barley, and it can be assumed that this continued for some time. See, also, Eugene L. Freeland, supra, 25 T.C.M. at 1478, ¶ 66,283 P-H Memo T.C. at 1650. There is no need for further evidence.

 The Government intimates that Section 708(b)(1)(A) terminates a partnership which no longer meets the definition of “partnership” in Section 761(a) and Treas. Reg. § 1.761-1 (a). Even if this is true, SBIC in the period from August 1956 to October 1957 could fit within the first sentence of Section 761(a), which uses the phrase “any business, financial operation, or venture,” and the regulation would not necessarily exclude it. (The remainder of the statutory subsection deals with the circumstances under which a partnership, as defined by the first sentence, may elect exclusion from the requirements of the partnership subchapter.) However, since Section 708, quoted in note 9 supra, provides that an “existing partnership” is considered terminated “only if” either subparagraph (A) or (B) applies and since Congress added Section 708 to the 1954 Code without a cross-reference to Section 761 (which was substantially carried over from the 1939 Code) and without copying the language of that section, it may well be that the issue of terminating an existing partnership is to be evaluated solely on the basis of Section 708 without regard to whether the “organization” of individuals involved, if judged ab initio, would be considered a partnership under Section 761(a). For similar reasons, Commissioner v. Culbertson, 337 U.S. 733, 740 (1949), and Gilford v. Commissioner, 201 F. 2d 735, 736 (C.A. 2, 1953), could be considered inapposite.

 The agreement did not say explicitly that limited partners had to consent to sales of partnership interests, but it did provide that partners could sell only to other partners, and the partners consistently treated the agreement as requiring the consent of all partners to a sale to outsiders. The defendant does not argue otherwise.

 We add that, in any event, we tend to the view, though we need not decide definitively, that the defendant has not given us a convincing reason for concluding that the property was held by the partnership as inventory on November 26, 1956, when Freeland and Lowthian sold their shares.